2018 IL App (1st) 171653

No. 1-17-1653

Filed: September 27, 2018

Fourth Division

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| KENNETH A. NELSON, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant | ) | Cook County |
| | ) | |
| v. | ) | No. 2016 L 5267 |
| | ) | |
| QUARLES & BRADY, LLP, | ) | Honorable |
| | ) | Lorna E. Propes, |
| Defendant-Appellee. | ) | Judge Presiding. |

_____

JUSTICE BURKE delivered the judgment of the court, with opinion.
Presiding Justice McBride and Justice Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial, the circuit court entered judgment in favor of defendant Quarles & Brady in this legal malpractice claim. The claim was predicated on Quarles & Brady's representation of plaintiff Kenneth Nelson in the federal district court in his suit against his former business partner in two automobile dealerships (the "Underlying Litigation"). The district court ruled against Nelson, but that decision was reversed on appeal by the Seventh Circuit Court of Appeals. Rather than pursue further litigation in the federal court on remand, the parties settled, and Nelson subsequently filed this legal malpractice action against Quarles & Brady. The circuit court found that Nelson had failed to establish that Quarles & Brady's representation

deviated from the standard of care or that Quarles & Brady's representation proximately caused him any damages. For the reasons that follow, we affirm the judgment of the circuit court.

¶ 2                                    I. BACKGROUND

¶ 3                              A. The Underlying Litigation

¶ 4                 1. *Nelson and Curia's Written Agreements and Stock Purchase Options*

¶ 5    Prior to 1989, Nelson was the sole shareholder in two automobile dealership corporations: Ken Nelson Auto Plaza, Inc. (Plaza), located in Dixon, Illinois, and Ken Nelson Auto Mall, Inc. (Mall), located in Sterling, Illinois. The two dealerships carried vehicles from Toyota, General Motors (GM), Nissan, and Chrysler. In 1989, Nelson hired Richard Curia as general manager, and the two entered into a stock purchase agreement (1989 SPA) whereby Curia would be able to acquire a 100% ownership interest in both corporations pursuant to a series of options. Under the 1989 SPA, Curia would initially pay $100,000 for 1000 shares in Plaza and 144 shares in Mall. The 1989 SPA also provided Curia with options to purchase additional shares. The first option permitted Curia to purchase an additional 1000 shares of Plaza and 144 shares of Mall for an additional $100,000. Under the second option, Curia could purchase 2009 shares of stock of Plaza and 300 shares of Mall, "which shares with previous purchased shares would represent 49% of the issued and outstanding shares of capital stock in said corporations." This option provided a formula for the purchase price of these shares, which was based on the corporations' net worth, accumulated depreciation, "LIFO (last in first out) reserve," and the total number of shares in each corporation. To determine the metrics for this formula, the parties would reference the monthly operating reports issued by GM and Nissan.

¶ 6    The third and final option provided that "[a]fter exercising the first two options to purchase as provided in this Agreement, [Curia] shall have a third option to purchase from

[Nelson] the remaining 4,171 shares of stock in [Plaza] and 612 shares of stock in [Mall] provided that [Curia] also offer to purchase the land and four buildings of the [Plaza] dealership *** at its appraised value." The third option also provided that the purchase price of the shares would be based on a valuation formula similar to the formula outlined in the second option. The 1989 SPA required Curia to provide written notice of his election to exercise each option.

¶ 7    In 1993, Nelson and Curia entered into another agreement intended to modify the 1989 SPA (1993 Modification). The 1993 Modification provided that "a mutual mistake of fact was made by Nelson and Curia in determining the fair market value of the capital stock of [Plaza and Mall.]" The 1993 Modification was therefore intended to "modify the [1989 SPA] to reflect the re-evaluation of the minority interest *** and to correct the mutual mistake of the parties." The 1993 Modification also included a new formula for calculating the price of the shares Curia could purchase from Nelson. Paragraph 5 of the 1993 Modification was titled "Purchase of Additional Shares" and provided that:

> "Curia shall have the right to purchase additional shares of stock in said corporations upon those terms and conditions subsequently agreed upon by the parties hereto. The purchase price for said additional shares of stock shall be determined by adding to the total net worth of each corporation a figure representing the accumulated 'LIFO' (last in first out) reserve and dividing the total sum thereof by the number of shares of each corporation."

Nelson testified that in entering into this modification, he and Curia intended to eliminate the options contained in the 1989 SPA, and that they had the understanding that if Curia wanted to purchase additional shares, they would be required to enter into a separate agreement. Curia testified that, at the time they entered into the 1993 Modification, he did not understand what the

word "subsequently" meant in the first sentence of the Purchase of Additional Shares section. Curia testified that the 1993 Modification was not intended to eliminate the 1989 SPA options and that he believed that the 1993 Modification, in conjunction with the options in the 1989 SPA, would permit him to purchase all of Nelson's shares. He testified that the parties entered into the 1993 Modification because he believed he had paid too much for the shares he received in the 1989 SPA.

¶ 8    The parties entered into subsequent written agreements in 1997 (1997 Harkness Agreement) and 2000 (2000 Agreement). The 1997 Harkness Agreement was drafted when Harkness purchased shares of Mall in 1997. The 1997 Harkness Agreement provided that it "supersede[d] all prior agreements and understanding between Nelson and Curia referring to future purchases of stock of [Mall.]" Harkness subsequently left Mall, and Mall repurchased his shares.

¶ 9    In 2000, Nelson and Curia entered into another agreement (2000 Agreement), titled "Amendment to Modification Agreements." The 2000 Agreement was drafted, at least in part, to delineate Curia and Nelson's intent with respect to the transfer of shares if either of them died. The 2000 Agreement also provided that Nelson and Curia "had previously entered into [the 1989 SPA] and [the 1993 Modification]," and copies of both were attached as exhibits. The 2000 Agreement provided that if Nelson died while the 1989 SPA and 1993 Modification were "in force," Curia must immediately purchase from Nelson sufficient shares in Plaza to make Curia the majority shareholder. The 2000 Agreement also set out another formula for the purchase price of those shares and Nelson's remaining shares, which differed from the formula in the 1989 SPA and 1993 Modification. The 2000 Agreement provided that it was "not a new modification agreement, but an amendment to the [1989 SPA] and the [1993 Modification]."

¶ 10    In 2002, Nelson and Curia formed CRANK, LLC (CRANK), which owned all of the real estate used by the two dealerships. Nelson and Curia each owned 50% of CRANK.

¶ 11                                    2. *The Stock Purchase Negotiations*

¶ 12    In 2004, Nelson and Curia began discussions regarding Nelson's desire to retire and sell all of his shares in both Plaza and Mall to Curia. According to Nelson, in July 2004, Curia agreed to buy Nelson's majority ownership interest in both corporations for $4.2 million. Nelson testified that the $4.2 million amount was based on the June 2004 GM financial statement and was calculated using the formula in the 1989 SPA. Nelson testified that this was an oral agreement and was never memorialized in writing. He contended, however, that evidence of this oral agreement was present in (1) corporate resolutions from both corporations' board of directors to accept the agreement, (2) correspondences from both Nelson and Curia with automobile manufacturers informing them of the stock purchase agreement and seeking approval for the transfer of ownership, and (3) a loan commitment document from Fifth Third Bank (Fifth Third) for $4.2 million obtained at Curia's request. Curia denied ever agreeing to purchase Nelson's shares for $4.2 million.

¶ 13                        a. The Directors' Resolutions and Stockholders' Minutes

¶ 14    On October 6, 2004, Nelson prepared the Minutes of the Annual Meeting of Stockholders for Plaza (Stockholders' Minutes). The Stockholders' Minutes provided that "Upon motion duly made and seconded, it was unanimously RESOLVED, that the following conditions of the sale and transfer of stock from [Nelson] to [Curia] be approved by the Board of Directors." The Stockholders' Minutes then listed nine "conditions." The first condition provided that the sale of the stock would be in accordance with the 1989 SPA. The remaining eight conditions provided that (1) the corporation would provide health care to Nelson and his wife for 10 years, (2) the

corporation would provide a new vehicle of Nelson or his wife's choice for 15 years, including the dealer license plates, (3) the corporation would provide a second vehicle of Nelson's choice for 10 years, (4) in the event that Nelson or his wife were unable to drive, the corporation would provide a driver, (5) the corporation would provide transportation for Nelson and his wife to and from the airport and vehicles for when they were "in town" as long as Nelson owned part of the properties that the dealership leased, (6) Nelson would have access to monthly GM financial statements, (7) the name "Ken Nelson" could be used for the corporation, and (8) a hold harmless agreement be written for the protection of Nelson and his family members. Nelson testified that these items represented his "retirement package" and were "perks" that he and Curia had agreed to after agreeing upon the $4.2 million purchase price. Nelson signed the Stockholders' Minutes, but Curia did not.

¶ 15    One day later, on October 7, 2004, Nelson prepared separate Special Meetings of Directors documents for Plaza and Mall (Directors' Resolutions). The Directors' Resolutions provided that "[a] resolution was duly moved and seconded to accept an agreement by the stockholders, [Nelson and Curia], that [Nelson] would sell his 8000 shares in this corporation (52.7%) to [Curia], and that the manufacturers be contacted to facilitate the transaction." The Directors' Resolutions further provided that Fifth Third would be funding the capital for the stock transfer. The Directors' Resolutions provided that the manufacturers would be contacted because automobile manufacturers require their approval for any transfer of majority ownership of a franchised dealership. Both Nelson and Curia signed the Directors' Resolutions.

¶ 16               b. Communications with Automobile Manufacturers

¶ 17    Both Nelson and Curia understood that any change of majority ownership interest would have to be approved by the automobile manufacturers. On October 28, 2004, Nelson sent letters

to the automobile manufacturers, informing them that he "proposes to sell" his shares in both dealerships to Curia. Representatives from the manufacturers responded, requesting additional documentation from both Nelson and Curia, including an ownership change agreement. As evidence of an ownership change agreement, Nelson sent the manufacturers the Directors' Resolutions. In November 2004, Curia submitted documentation to the automobile manufacturers, including the Toyota Minimum Standards, the Toyota Dealer Performance Evaluation, Dealer Biographical Information, and an Application for Nissan Dealer Sales and Service Agreement.

¶ 18                              c. Fifth Third Loan Commitment

¶ 19    In September 2004, Curia and Nelson approached Inghram Debes, the relationship manager in the automobile dealership finance group at Fifth Third, to request a loan for Curia to purchase Nelson's shares. On November 4, 2004, Debes sent a letter to Curia to "confirm that Fifth Third Bank has approved and is committed to lend [Plaza] a term loan totaling $4,200,000. The purpose of this loan is to provide you with sufficient funds to buy-out [Nelson's] remaining ownership interest in [Plaza and Mall]." Curia testified that this letter was necessary to show the automobile manufacturers that he could secure the funds to proceed with the buyout.

¶ 20        3. *Breakdown of Negotiations and Curia's Option Exercises*

¶ 21    On October 26, 2004, Nelson sent Curia a document entitled "Chronology of [Nelson] and [Curia] Stock Purchase" (Chronology). Nelson testified that he prepared this document after he learned that Curia was "balking" on the leases and the items in the Stockholders' Minutes. In the Chronology, Nelson recounted their business partnership, including the 1989 SPA and 1993 Modification. Nelson stated that:

"My offer to have you buy me out at this time was with great consideration for you. We have a bank ready and able to handle the transaction for you at very good interest rates. However, I didn't believe that you would be so difficult in extending to me things that I really need for retirement; and to this date you have not come up with a retirement package for me.

\*\*\*

I will be calling the manufacturers; however, as I told you when I was in earlier this month, there is no reason for me sending any letters of my wish to sell until we have a package put together."

¶ 22    On November 4, 2004, Curia responded to the Chronology. In response to Nelson's request for a retirement package, Curia responded that he did not "see anywhere in our agreement that I was to fund a retirement package." Curia testified that by "agreement," he was referring to the 1989 SPA and the 1993 Modification. Curia also wrote "please allow this to serve as written notice to exercise my option to purchase the remainder of the stock" in Plaza and Mall. Curia expressed his desire to close the transaction by the end of the year. On November 3, 4, and 10, Curia submitted documentation to the automobile manufacturers. On November 4, Curia also submitted an Investment Proposal Summary to GM, to which he attached the letter from Fifth Third committing to the $4.2 million loan. On November 17, 2004, Debes sent the loan documents for the "Curia buy-out" to Toyota and stated that Fifth Third was "ready to fund this transaction when instructed by Mr. Curia." Debes sent the same loan documents to Nissan on November 29, 2004.

¶ 23    On December 3, 2004, Nelson wrote a letter to Curia, offering to sell his shares in Plaza and Mall for $3.4 million, using calculations based on the September 2004 GM financial

statement. On December 21, 2004, Nissan sent a letter to Nelson and Curia, informing them that it had approved the proposed stock purchase agreement conditioned on the receipt of several documents from both the corporations and Fifth Third. On February 28, 2005, Curia wrote an email to Nelson, in which he stated that he "had more than one attorney review our agreements, and they all have the same conclusion. All we are asking you to do is honor our agreements."

¶ 24 On March 2 and 3, Curia sent Nelson a "Notice of Exercise of Option" for both Mall and Plaza (Option Exercises). In the March 2 Option Exercise, Curia stated that he had previously exercised his first option under the 1989 SPA. Curia stated that the second option gave him "the right to purchase from you an additional number of shares of capital stock of [Plaza] and [Mall] that would give me 49% of the outstanding capital stock of each Corporation." Curia stated that he calculated that to be 193 shares of Plaza and 170 shares of Mall. Curia notified Nelson that he was exercising his option to purchase those shares in accordance with the terms of the 1989 SPA and the 1993 Modification. In the March 3 Option Exercise, Curia stated that he was exercising the third option under the 1989 SPA to purchase Nelson's remaining shares in Plaza and Mall and Plaza's land and four buildings.

¶ 25                          4. *Nelson Retains Quarles & Brady*

¶ 26 On March 8, 2005, Nelson sent a letter and a packet of documents to Kimberly Johnson, an attorney at Quarles & Brady's Naples, Florida office who had previously worked on Nelson's estate planning. In the letter (Johnson Letter), Nelson informed Johnson that in September 2004, he approached Curia about purchasing his stock in the corporations. Nelson stated that he gave Curia some conditions for the purchase, including to meet the selling price set forth in the 1989 SPA based on the September 2004 GM financial statement. Nelson also stated that the agreement was conditioned upon Nelson receiving vehicles from the dealership with insurance, health

insurance for him and his wife, transportation to Dixon, Illinois to inspect buildings, hold harmless agreements, and access to GM financial statements. Nelson further stated that he and Curia met in January 2005 and realized that they were not in agreement with either the purchase price or "its application." Nelson stated that in January and February they met with brokers in an attempt to sell the dealerships to a third party, but were unable to choose a broker. Nelson then received the letters from Curia, informing him of his intent to exercise his options.

¶ 27    Nelson stated that under the written agreements, Curia could exercise his options to purchase only if he and Nelson mutually agreed or if one of them died. Nelson stated that "it was expressly understood that there would be no sale unless it was mutually agreed to and beneficial to both shareholders." Nelson attached to the Johnson Letter the 1989 SPA, the 1993 Modification, the 2000 Agreement, the October 26, 2004, Chronology with Curia's response, the unsigned October 6, 2004, Stockholders' Minutes, Curia's February 28, 2005, email in which Curia asked Nelson to honor their "agreements," Nelson's response to that email on the same date, and Curia's March 2 and 3, 2005, Option Exercises (Johnson Packet). Johnson referred Nelson to James Gatziolis, a partner and transactional lawyer in Quarles & Brady's Chicago office.

¶ 28    On March 13, 2005, Nelson sent a draft of his response letter to Curia's Option Exercises to Gatzilios. In the draft letter, Nelson stated that Curia's Option Exercises had not met the conditions of the 1993 Modification. Nelson specifically pointed to the language in the 1993 Modification that provided that any sale of stock would be based "upon those terms and conditions subsequently agreed upon by the parties." Nelson further stated in August 2004, he offered Curia the opportunity to purchase his stock in Plaza and Mall "upon certain terms and conditions" which were set forth in a letter Nelson left on his desk on December 3, 2004. Nelson

represented that those terms and conditions were that the October 6, 2004, Stockholders' Minutes be signed by both parties, that the newly agreed leases for the properties owned by CRANK be signed by both parties, and that the September 30, 2004, GM financial statement be used for the sale price. The draft letter was revised by Gatziolis, then further revised by Nelson, and sent to Curia on March 14, 2005.

¶ 29    On March 29, 2005, Nelson sent a letter to Gatziolis, representing that he made his first offer to have Curia purchase his shares in July 2004. On April 20, 2005, Nelson, his wife Carol Nelson (Carol), and his son Korey Nelson (Korey) met with Gatziolis at the Quarles & Brady Chicago office. Carol took notes at the meeting, but at trial was unable to explain what the context of her notations meant outside of the words on the page. Carol wrote mostly in unattributed shorthand phrases such as "Any other conditions would be: formula for stock price—June 2004" and "Get this deal behind you!" After the meeting, Gatziolis brought Leonard Shifflett, a litigation attorney at Quarles & Brady, onto the case to handle the litigation.

¶ 30                              a. The Declaratory Judgment Complaint

¶ 31    On April 29, 2005, Quarles & Brady filed a complaint, on Nelson's behalf, for declaratory relief in the United States District Court for the Northern District of Illinois. The complaint provided that, in July 2004, Nelson approached Curia about purchasing Nelson's shares in the dealerships, but the parties could not reach an agreement about the terms and price. Quarles & Brady alleged that Curia's March 2 and 3, 2005, Option Exercises were defective because the 1993 Modification and 1997 Harkness Agreement effectively terminated the options in the 1989 SPA. The complaint therefore sought a judgment declaring that Curia had no exercisable option to purchase Nelson's shares in the corporations, that Curia's March 2 and 3, 2005, Option Exercises were void, and that Curia was in breach of the 1989 SPA, the 1993

Modification, and the 1997 Harkness Agreement. Curia filed a separate action in the district court seeking specific performance of the options, and the two cases were consolidated.

¶ 32                    b. The Summary Judgment Motions

¶ 33                    i. *Curia's Motion for Summary Judgment*

¶ 34    Quarles & Brady and Curia filed cross-motions for summary judgment. In his motion for summary judgment, Curia contended that the parties' written agreements unambiguously provided him the right to purchase Nelson's shares in both corporations and that the price of the shares should be $2,269,694.80 based on the formula in the 1993 Modification. Despite arguing that the agreements were unambiguous, Curia contended that in Paragraph 5 of the 1993 Modification, which provided that "Curia shall have the right to purchase additional shares of stock in said corporations upon those terms and conditions subsequently agreed upon by the parties hereto," he and Nelson actually intended to use the word "previously," rather than the word "subsequently." Curia asserted that this construction of the paragraph would allow the non-material terms of the 1989 SPA to be incorporated into the 1993 Modification and that Curia would have the right to exercise the 1989 SPA options. This construction of the 1993 Modification would also defeat Nelson's contention that the 1993 Modification created an "agreement to agree." Curia contended that such a result was logical because Nelson's construction of the written agreement would give Curia a right to purchase the shares, but not the opportunity to do so unless Nelson agreed.

¶ 35        ii. *Nelson's Communication with Quarles & Brady After Curia's Motion*

¶ 36    On July 16, 2005, Nelson sent an email to Shifflett and Gatziolis regarding the 1997 documents. Nelson stated that he "found the items that go with the letter to David Williamson our corporate attorney." Nelson suggested that Quarles & Brady "ask Mr. Williamson for all of

his notes and documents on all of the four agreements that he produced for both [Curia] & I and Harkness, which includes the 'subsequently' one."

¶ 37    On July 26, 2005, Nelson faxed Quarles & Brady a document entitled "Ken's Story" in response to Curia's motion. In Ken's Story, Nelson stated that in July 2004, he offered to retire from the corporations, and in September 2004, he presented Curia with an offer to sell his shares for $4.1 million. He stated that he and Curia further negotiated and Nelson made another offer on December 4, 2004, for Curia to purchase his shares in both corporations for $3.4 million. Nelson further provided that "[a]fter again trying to negotiate with Curia through December 2004 it was apparent even though Curia had the financing from Fifth Third Bank to make the purchase, he was unwilling to come to terms nor even to make a counter offer."

¶ 38    Before filing the summary judgment motion, Quarles & Brady sent a draft of the motion to Nelson and Korey for their review. Nelson and Korey sent back an edited version of the motion. In a paragraph beginning "[i]n 2004 [Nelson] approached Curia *** about the possibility of Nelson selling his majority share of stock in [Plaza] and [Mall]" Nelson and Korey added that "Nelson and Curia began negotiating the price and manner of the stock sale," but "at some point Curia began maintaining he possessed" exercisable options. Further, in the statement of facts of the motion, Nelson and Korey wrote that in July 2004, Nelson met with Curia and offered to sell his shares in the corporations to Curia. They further wrote that, in September 2004, Nelson presented an offer to sell his shares to Curia, "but Curia did not accept." Nelson and Korey specifically added language that Curia did not accept Nelson's September 2004 offer. The original draft of the motion also stated that Curia never accepted Nelson's offer, but Nelson and Korey edited it to read that "Curia never accepted any of Nelson's offers," changing the word "offer" from singular to plural.

¶ 39          iii. *Quarles & Brady's Motion for Summary Judgment*

¶ 40    On August 3, 2005, Quarles & Brady filed its memorandum in support of Nelson's motion for summary judgment and in opposition to Curia's motion for summary judgment. In its memorandum, Quarles & Brady asserted that a plain reading of the 1993 Modification contradicted Curia's argument that he had a unilateral right to purchase Nelson's shares pursuant to the 1989 SPA. Quarles & Brady contended that, under Paragraph 5 of the 1993 Modification, Curia could purchase additional shares only "upon those terms and conditions subsequently agreed upon by the parties hereto," and there was no allegation that the parties ever subsequently agreed to any "terms and conditions."

¶ 41    As for Curia's assertion that the parties intended to use the word "previously" rather than "subsequently" in Paragraph 5, Quarles & Brady contended that Curia did not raise this issue in his affidavit and his motion merely "suggests" that previously was intended because the next sentence of Paragraph 5 established the price for the shares. Quarles & Brady contended that Curia's assertion that "any terms that required later determination would not be material" is contrary to Illinois law, which provides that if essential terms are missing or uncertain, then there is no contract. Quarles & Brady asserted that the court should reject this contention and enforce the contract as written, which required Curia to negotiate with Nelson if he wished to purchase shares from him, and if they could not come to an agreement, then either party could sell their shares to a third party.

¶ 42    Quarles & Brady also argued that the 1997 Harkness Agreement voided the options or any rights Curia held under the 1989 SPA and 1993 Modification. Quarles & Brady further contended that Curia's options failed for lack of consideration. In the alternative, Quarles & Brady asserted that even assuming Curia had the option to purchase Nelson's shares, his Option

Exercises were deficient because Curia calculated the purchase price under the 1993 Modification rather than the formula in the 1989 SPA options. Quarles & Brady contended that if the court determined that Curia's Option Exercises were valid, the price of Nelson's shares should be determined by the formula in the 2000 Agreement.

¶ 43    Quarles & Brady also drafted an affidavit for Nelson, which repeated much of the same information from Nelson and Korey's edited comments to the motion for summary judgment, including that Curia did not accept Nelson's September 2004 offer and that "Curia never accepted any of [Nelson's] offers" despite having financing from Fifth Third. Nelson signed the affidavit, and it was attached to the summary judgment motion.

¶ 44                              iv. *Curia's Response*

¶ 45    On September 2, 2005, Curia filed an affidavit and a response to Nelson's statement of undisputed facts. In his response, Curia acknowledged that Nelson offered to sell his shares to him in July 2004, but Nelson requested a number of provisions including that the corporations provide health insurance for Nelson and his wife and new cars for 15 years. Curia contended that these demands and the per-share price demanded by Nelson resulted in a purchase price that significantly exceeded the prices calculated under the 1989 SPA and 1993 Modification. Curia asserted that he did not accept any of Nelson's offers, but as a courtesy to Nelson, "he listened and reacted to every offer Nelson made." Curia contended that each of Nelson's offers contained the additional provisions from the July offer. In his affidavit, Curia averred that in Paragraph 5 of the 1993 Modification, he and Nelson "intended to use the word 'previously' rather than the word 'subsequently.' "

¶ 46    v. *Nelson's Communications with Quarles & Brady Before District Court Ruling*

¶ 47    On September 17, 2005, Nelson sent an email to Shifflett in which he stated that when he went to Curia in July 2004 to retire, he put together a retirement package. Nelson stated that he thought it would be fair to have some formula for the basis, so he used a basis that they both understood and had agreed to before to negotiate. Nelson concluded that he "was not really going to [Curia] with the [1989 SPA] in hand, I was going to him with a package that I felt we could negotiate on." Nelson sent another email to Shifflett and Gatziolis on November 22, 2005, indicating that he wanted them to communicate to the presiding magistrate that "we have tried to negotiate with [Curia] since July of 2004 and put many offers on the table, but without any response to our offers."

¶ 48                            5. *The District Court's Ruling*

¶ 49    On February 7, 2006, the district court entered its judgment. The district court granted Nelson's motion for summary judgment with respect to Mall, but granted Curia's motion for summary judgment with respect to Plaza. The district court found that there was no indication that the 1993 Modification was intended to eliminate the options in the 1989 SPA, but was intended to correct a mutual mistake by Nelson and Curia in valuing the stock of the corporations purchased by Curia. With regard to the "subsequently" language in Paragraph 5 of the 1993 Modification, the district court determined that where the sentence following the "subsequently" sentence established a method for determining the purchase price of the additional shares, it would "def[y] reason (particularly in light of the absence of any expression of intent to change Curia's right to buy all Nelson's shares) that the parties would provide a mechanism for determining the purchase price but intend it to kick in only if they subsequently agreed on other terms and conditions."

¶ 50   The district court further found that the 2000 Agreement further reinforced Curia's right to purchase Nelson's stock in Plaza where it provided Curia the right to purchase Nelson's shares if Nelson died while the 1989 SPA and 1993 Modification were still in force. The court determined that the 1989 SPA, in conjunction with the 1993 Modification and the 2000 Agreement, unambiguously provided Curia with the option to purchase Nelson's shares in Plaza with the price determined under the formula set forth in the 2000 Agreement.

¶ 51   The district court determined, however, that the 1997 Harkness Agreement superseded the 1989 SPA and the 1993 Modification with respect to Mall, but not Plaza. Accordingly, the district court found that the Mall shares were subject to the 1997 Harkness Agreement and that Curia's Option Exercises were defective with respect to those shares. The selling price of the Plaza shares and other issues remained pending in the district court.

¶ 52          6. *Nelson's Post-Judgment Communications and Further Proceedings*

¶ 53   On March 10, 2006, at Nelson's request, Toyota sent him two "resolution letters and an ownership change proposal letter" that had been sent to Toyota on October 28, 2004. This included the Special Meetings of Directors document for Plaza on October 7, 2004. Nelson forwarded these documents to Gatziolis and told him that (1) he had never received the "letter," (2) to his knowledge, Toyota had never received a "Resolution of the Board" or any ownership change agreement, and (3) perhaps Curia had "made these up." Nelson sent a second email to Gatziolis later that day, stating that he "did not have a copy of this directors meeting."

¶ 54   On March 21, 2006, Nelson emailed Julie Thomas at Toyota. Thomas had taken over the position of Market Representation Administrator from Samuel Zangri, who had held the position in October and November 2004, when Nelson and Curia first contacted Toyota about the

ownership change. Thomas replied to Nelson's email that the "original stock purchase agreement included both [Plaza] and [Mall]. The total selling price to our understanding was $4,200,000."

¶ 55    On June 5, 2006, Quarles & Brady filed an amended complaint on Nelson's behalf, alleging once again that Curia did not have an exercisable option to purchase Nelson's shares in Plaza. Quarles & Brady also alleged that Curia had breached his fiduciary duty and misappropriated the corporation's funds. In response, Curia filed a motion for summary judgment, asking the court to find that his Option Exercises were valid.

¶ 56    On August 29, 2006, Nelson sent an email to Shifflett and Paul Cahill, another attorney at Quarles & Brady who had been assigned to work on Nelson's case, with his comments on Curia's answers. In his comments Nelson stated that he and Curia intended what they wrote in the agreements, "not what we now think." Nelson stated that he initially began negotiations with Curia in July 2004 and sent letters to manufacturers at a price he and Curia negotiated and agreed to "4.2m (stock only, both corps)." Nelson also noted that there was a letter from Fifth Third, showing that it agreed to loan $4.2 million, but it was "then Curia decided that he didn't want to pay much [*sic*]." Nelson stated that he did not refuse to cooperate, but in September 2004, prior to Curia "circumventing" what they had negotiated, he sent letters to the manufacturers, recommending the sale. Nelson stated that he and Curia used the 2000 agreement as a "base" and then "began adding other perks," but there was a delay because Curia refused to do what the manufacturers demanded. Nelson stated that the delay was also caused by "Curia not seeking the corporations['] accountants to prepare a selling price" because, if he had done so, he would have known about "intangible values and goodwill." Nelson acknowledged that none of the agreements used the words goodwill or intangibles, but asserted that he and Curia discussed goodwill every time they wrote a new agreement.

¶ 57    On November 17, 2006, the district court granted Curia's motion for partial summary judgment in part and denied it in part. The district court found that Curia properly exercised his option to purchase all of Nelson's Plaza shares through his Option Exercises on March 2 and 3, 2005. The court found that the purchase price would be calculated, using the formula in the 2000 Agreement, and would be based on the February 2005 GM financial statement.

¶ 58    On November 27, 2006, Korey emailed Shifflett, advising him that "[a]pparently sometime back in November of 2004, [Nelson], [Curia] and [Debes] had a meeting where [Curia] agreed to pay 4.2 million [for] the stock." Debes then sent Curia a letter confirming the amount and the financing. Korey emailed Shifflett again on December 3, 2006, with suggestions for Quarles & Brady's motion for reconsideration. Korey suggested adding a sentence in the motion that stated: "For example, in November or December[ ] 2004, Curia and Nelson agreed on a price of 4.2 million for the stock in the presence of Ghram Debes, as evidenced by [the] attached letter." Korey suggested that Quarles & Brady then include the Fifth Third letter from November 2004, committing to the $4.2 million loan as an exhibit.

¶ 59    On June 27, 2007, the district court entered an order granting Curia's motion for summary judgment with regard to specific performance for the sale of Nelson's Plaza shares. The court also found that the 2000 Agreement clearly and unambiguously did not include any adjustment for goodwill or other intangible assets in determining the purchase price. The court therefore set the purchase price at $2,188,720 for Nelson's shares in Plaza. The court also left a number of issues pending, including whether Curia was entitled to use the name "Ken Nelson" for Plaza after he purchased the shares, and whether Curia was required to provide vehicles for Nelson and his wife.

¶ 60                    7. *Appeal and Motion for Stay*

¶ 61    Quarles & Brady appealed the district court's judgment granting Curia's motion for specific performance with regard to the Plaza shares to the Seventh Circuit while the unresolved issues the district court identified in its order remained pending in the district court. On September 5, 2007, Quarles & Brady filed a motion to stay the district court's order. In that motion, Quarles and Brady alleged for the first time that in "September 2004, Curia and Nelson reached a verbal commitment whereby Curia would pay $4,200,000.00 for Nelson's shares in both companies and would provide Nelson with certain perks including two automobiles of his choice for a period of 15 years." The motion also alleged that Curia and Nelson continued to negotiate a fair market price for Curia to purchase all of Nelson's shares in the two corporations, but sometime in late 2004 or early 2005, Curia decided that he could pay less than fair market value for Nelson's shares if he tried to enforce the 1989 SPA and 1993 Modification. This information mirrored the statements in Nelson's affidavit that accompanied the motion to stay. The district court denied the motion to stay.

¶ 62    On February 15, 2008, while the appeal was still pending in the Seventh Circuit, Quarles & Brady filed a second amended complaint for declaratory relief in the district court. In its claim for breach of fiduciary duty in the amended complaint, Quarles & Brady alleged that in 2004 Curia agreed to purchase Nelson's shares of Plaza and Mall for $4.2 million. Quarles & Brady alleged that Nelson, in reliance on this agreement, worked to obtain the automobile manufacturers' approval for the sale, and Curia indicated to several third parties that he and Nelson had reached an agreement, but he subsequently reneged.

¶ 63                              8. *Nelson Discharges Quarles & Brady*

¶ 64    In April 2008, Nelson discharged Quarles & Brady. That same month, pursuant to the district court's order, Nelson sold his shares in Plaza to Curia for $2.188 million. Nelson retained attorney Stewart Weltman, who handled the appeal, the remaining issues in the district court, and the ultimate settlement with Curia.

¶ 65                          9. *Seventh Circuit Ruling and Settlement*

¶ 66    On November 20, 2009, the Seventh Circuit reversed the district court's ruling granting Curia's motion for summary judgment and remanded the case for further proceedings. *Curia v. Nelson*, 587 F.3d 824, 832 (7th Cir. 2009). In so ruling, the Seventh Circuit found that, despite neither party raising the issue, the parties' written agreements were ambiguous. *Id.* at 829. Specifically, the court found that Paragraph 5 of the 1993 modification did not explicitly cancel the options, but it also was not inconsistent with the continued existence of the options. *Id.* at 830. Accordingly the court found that summary judgment was inappropriate under the circumstances. *Id.* at 832.

¶ 67    Rather than continuing the litigation in the district court after remand, in August 2010, Curia and Nelson reached a settlement agreement whereby Nelson transferred all of his shares in Mall to Curia in exchange for releasing Nelson of personal liability for Mall's debt to Fifth Third. As part of the settlement agreement, Curia also paid Nelson $855,888 for Nelson's 50% ownership stake in CRANK.

¶ 68                    B. Nelson's Malpractice Action Against Quarles & Brady

¶ 69    Following the settlement with Curia, Nelson filed a complaint for legal malpractice against Quarles & Brady, alleging that it was negligent in its representation of him in the Underlying Litigation. The complaint was subsequently amended, and eventually dismissed by

the circuit court pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2010)). Nelson appealed, and this court reversed and remanded, finding that, based on Nelson's allegations, it could not be said that Nelson could prove no set of facts from which a jury could find Quarles & Brady's alleged negligence was the proximate cause of Nelson's damages. *Nelson v. Quarles & Brady, LLP*, 2013 IL App (1st) 123122, ¶ 75.

¶ 70     On remand, Nelson filed the complaint at bar, alleging that Quarles & Brady was negligent in its representation throughout the Underlying Litigation. Specifically, Nelson alleged that Quarles & Brady was negligent in (1) failing to argue that Curia's Option Exercises were ineffective because they were not the mirror image of the 1989 SPA options, (2) failing to argue that the 1989 SPA and subsequent agreements were ambiguous, and (3) failing to investigate and enforce the $4.2 million oral agreement that Nelson and Curia reached in 2004. At trial, 15 witnesses testified over the course of 15 days, including Shifflett, Gatziolis, Nelson, Curia, and two expert witnesses.

¶ 71                                 1. *Curia's Option Exercises*

¶ 72     Shifflett testified that his primary goal in filing the complaint was to defeat Curia's Option Exercises. He acknowledged Curia's Option Exercises attempted to purchase a different number of shares than the amount of shares listed in the 1989 SPA options, but testified that he did not raise an argument that the Option Exercises were defective because they were not the mirror image of the 1989 SPA options because he did not think it would be persuasive. He testified that Quarles & Brady considered raising that argument, and the argument appeared in a draft of the reply brief in the Underlying Litigation, but Quarles & Brady ultimately chose to not raise that argument because the changes in the number of shares were agreed to by the parties in subsequent documents and because the second option in 1989 SPA provided Curia the option to

purchase 49% of the outstanding shares and third option provided Curia the option to purchase Nelson's "remaining" shares, which is what Curia sought in his Option Exercises. He noted that because the 1989 SPA options provided a percentage, he believed that relevant case law would have supported the idea that as long as Curia purchased 49% of the shares with the second option and the remaining shares with the third option, as specified in the 1989 SPA, the district court could make an equitable adjustment to the actual number of shares to allow the purchase to go forward.

¶ 73    Edward Joyce, Nelson's expert witness, testified that Quarles & Brady should have argued that Curia's Option Exercises were defective because they were not a mirror image of the 1989 SPA options. Joyce testified that as a result of the corporations' recapitalization following the 1989 SPA, it would have been impossible for Curia to exercise the options pursuant to the terms of the 1989 SP, and thus his Option Exercises were ineffective. Joyce also testified that the case Shifflett relied on in contending that the court could make equitable adjustments to the number of shares was not relevant because the agreement in that case had a provision allowing the number of shares to be adjusted in the event of recapitalization, but there was no such provision in Nelson and Curia's agreements. Joyce opined that had Quarles & Brady raised this argument, it was more likely true than not that they would have defeated Curia's summary judgment motion. Joyce noted that there would be no disadvantage to raising this argument as an alternative method of relief and that Quarles & Brady's failure to raise this argument showed a failure to exercise the knowledge, skill, and care ordinarily used by a reasonably careful attorney under the circumstances.

¶ 74    On cross-examination, Joyce acknowledged that Quarles & Brady made a version of the mirror image argument by including a contention that Curia's Option Exercises erroneously used

the price formula from the 1993 Modification. However, Joyce testified that these were the wrong facts to support this claim and that Quarles & Brady should have instead argued that Curia attempted to purchase the wrong number of shares or that the options required Curia to offer to purchase Plaza's real estate. Joyce also acknowledged that Nelson could have raised these arguments on remand from the Seventh Circuit.

¶ 75    Gino DiVito, Quarles & Brady's expert, testified that it was unnecessary for Quarles & Brady to argue that the number of shares had changed from the 1989 SPA, because, as Shifflett testified, the second option specified a percentage of shares, 49%, for Curia to purchase and then the third option specified that Curia could purchase the "remaining" shares. DiVito noted that Curia's Option Exercises mirrored these terms. DiVito also acknowledged that this argument was included in a draft brief by Quarles & Brady, but ultimately was not raised.

¶ 76                                    2. *Ambiguity*

¶ 77    With regard to ambiguity, Shifflett testified that he argued the written agreements were unambiguous in the motion for summary judgment because he did not believe there were any issues of fact to resolve. He also testified that Nelson did not provide any extrinsic evidence that would offer a different interpretation of the 1993 Modification. Gatziolis testified that part of their strategy at trial was to avoid discovery and get a ruling on their summary judgment motion. Shifflett testified that if there were an ambiguity in the written agreements, the district court could identify it, *sua sponte*, and deny the motion for summary judgment, and Quarles & Brady would be able to better focus its discovery.

¶ 78    Joyce testified that Quarles & Brady should have argued that the written agreements were ambiguous. Joyce noted that Paragraph 5 of the 1993 Modification, the "subsequently" paragraph, did not specify how many shares Curia would purchase or how Curia would pay for

them. Joyce further testified that it was ambiguous whether this paragraph was consistent with the 1989 SPA. Joyce testified that reading all of the agreements together, there was no clear indication of how Curia could exercise his options or whether he had a right to purchase Nelson's shares. Joyce further testified that if the district court found the agreements were ambiguous, it would not have granted Curia's motion for summary judgment, and there would have been an evidentiary hearing where Quarles & Brady could have introduced extrinsic evidence to demonstrate what Curia and Nelson thought when they entered into the agreement. Joyce testified that, within a reasonable degree of certainty, he believed that this argument would have prevailed had Quarles & Brady raised it before the district court. On cross-examination, Joyce acknowledged that although the Seventh Circuit found the agreements ambiguous, it also found that the interpretation of the written agreements urged by Quarles & Brady before the district court was a reasonable one.

¶ 79    DiVito testified that it was reasonable under the circumstances for Quarles & Brady to argue that the written agreements were not ambiguous. He testified that it was reasonable for Quarles & Brady's to argue that Paragraph 5 of the 1993 Modification negated any unilateral right by Curia to exercise the options. He opined that there was no downside to arguing that the agreements were not ambiguous because the district court could find, *sua sponte*, that the agreements were ambiguous, regardless of what the parties claimed. He also noted that arguing ambiguity could have opened the door for Curia to raise arguments about what the parties intended when they entered into the agreements.

¶ 80                               3. *$4.2 Million Oral Agreement*

¶ 81    Nelson testified that in 2004, he decided he wanted to leave the automobile dealership business and retire. He approached Curia about buying out his share of stock in Plaza and Mall,

and Curia agreed. They based the price on the formula in the 1989 SPA and the June 2004 GM financial statement and came up with a price a little more than $4.1 million, so they rounded it up to $4.2 million for Nelson's shares in both Plaza and Mall. Nelson testified that he said "I'll sell you my shares for [$]4,200,000," and Curia was "very excited" and said "yes."

¶ 82    Nelson testified that they did not discuss when the deal would close at that time, but they knew they needed the automobile manufacturers' approval for the transaction to approve Curia as the dealer. Nelson testified that he would have handled that process and that he could not direct the manufacturers to process an approval within a certain period of time. Nelson testified that neither he nor Curia said that the deal would not take place if they could not close the transaction by December 31, 2004.

¶ 83    Nelson further testified that in August or September, he and Curia met with Debes to ask Fifth Third to fund the $4.2 million to buy the stock. After that meeting, Nelson and Curia discussed the perks that Nelson was seeking, such as the health insurance and vehicles, and Curia indicated that he would be willing to provide those perks in exchange for the continued use of Nelson's name for the dealerships. Nelson testified that he prepared the Stockholders' Minutes and the Directors' Resolutions. He believed that the nine conditions in the Stockholders' Minutes were a separate agreement from the $4.2 million stock purchase agreement. He also testified that the "agreement" referred to in the Directors' Resolutions was the $4.2 million oral agreement. Nelson testified that Curia signed the Directors' Resolutions, but did not sign the Stockholders' Minutes because he said it was "too much." Nelson nonetheless moved forward with contacting the manufacturers to obtain approval for the transaction.

¶ 84    Curia testified that, in 2004, he told Nelson that he wanted to "abide" by their written agreements and buy out his shares. Nelson, however, wanted more than what was provided for in

the agreements; he wanted a retirement package. Curia testified that he never accepted any of Nelson's offers to sell his shares, and he never agreed to two separate agreements—one for the sale of Nelson's shares and one for the retirement package for Nelson. Curia testified that when he signed the Directors' Resolutions, he believed he had an agreement to buy Nelson's shares for a "sum certain" as calculated in accordance with the 1989 SPA. Curia further testified that when he went to Fifth Third in 2004 and secured funding for the purchase of Nelson's shares, it was merely a preapproval and was not tied to any purchase price because the actual price of the shares could change each month, depending on the performance of the dealership, and the GM financial statements. Curia knew that as part of the approval process, he would have to provide manufacturers with proof that he could secure the funds to proceed with the buyout. Curia testified that his intention was to borrow enough money to purchase Nelson's shares and to use the remainder as working capital and "combine loans."

¶ 85     Nelson testified that, in late November or early December 2004, Curia told him that he was paying too much for Nelson's shares. On December 3, 2004, he sent a letter to Curia, attempting to renegotiate the sale. He testified that he did not mention their $4.2 million oral agreement in this letter because Curia had already rejected that offer, so he was attempting to make another offer to sell his shares for $3.4 million, but Curia did not accept. In January 2005, he and Curia discussed approaching a broker to find a third party to purchase the dealerships and the real estate.

¶ 86     After receiving Curia's Option Exercises in March 2005, Nelson sent a letter to Johnson at Quarles & Brady. Nelson testified that the Johnson Letter did not mention the $4.2 million oral agreement because at the time he was only concerned with Curia's Option Exercises. With the assistance of Gatziolis, Nelson sent a letter to Curia on March 14, 2005, with an offer to sell his

shares for $3.4 million based on the September 2004 GM financial statement. Nelson understood that if Curia accepted the offer in this letter, he would not receive any retirement package or perks. Nelson acknowledged that he sent an email to Gatziolis on March 29, 2005, in which he did not mention the $4.2 million oral agreement.

¶ 87     On April 20, 2005, Nelson, Carol, and Korey met with Gatziolis at the Quarles & Brady office in Chicago. Nelson testified that, at that meeting, he told Gatziolis about the $4.2 million oral agreement and that Fifth Third had agreed to fund the transaction. Nelson testified that Gatziolis told him that oral agreements were not recognized in Illinois and did not ask him if he could provide any more information about the oral agreement. Carol testified that during the meeting, she was taking notes, but was not paying close attention. Referring to her notes, Carol testified that Gatziolis told them to "get over it," and she believed that when he said that, he was referring to the $4.2 million oral agreement based on a "4.2" she had also written on the page. She acknowledged on cross-examination, however, that, based on her notes, she could not be sure whether that was said by Gatziolis or Nelson or whether the notes were her own thoughts.

¶ 88     Korey, who was the secretary of Mall and Plaza, and also a director, testified that the purpose of the April 20, 2005, meeting with Gatziolis was to try to reach a resolution with Curia after he had sent notice of his intent to exercise his options to purchase Nelson's shares. Korey testified that Nelson told Gatziolis that he and Curia had reached an oral agreement to sell his shares in both Plaza and Mall for $4.2 million. Gatziolis asked Nelson if he had written the agreement down, but Nelson told him that they had not. Gatziolis told Nelson that "oral agreements are not enforceable in the state of Illinois. You can ask Korey about it. He knows. He studied the statute of frauds in law school." Throughout the meeting, Gatziolis repeatedly told Neslon to get a deal done with Curia so that he could move on and retire.

¶ 89    Gatziolis testified that when he first became involved in Nelson's case, Nelson wanted to know if he was required to honor Curia's Option Exercises. He learned that Nelson wanted to sell all of his shares and retire, but wanted a different price than what Curia had offered. He helped Nelson write a letter to Curia on March 13, 2005, and did not recall Nelson telling him about any oral agreement for $4.2 million. Before meeting with Nelson, Gatziolis reviewed the Directors' Resolutions, the 1989 SPA, and subsequent written agreements; the November 2004 Fifth Third loan commitment letter for $4.2 million; and the other materials in the Johnson Packet, including the Chronology with Curia's responses. Gatziolis testified that none of these documents raised a question in his mind that Curia and Nelson had entered into an oral agreement in 2004. Specifically, Gatziolis testified that the comments made by Curia and Nelson in the Johnson Packet showed that they were not in agreement about the retirement package. Gatziolis further noted that there was no mention of sale price of $4.2 million in any of the documents he reviewed.

¶ 90    Gatziolis further testified that Nelson did not tell him about a $4.2 million oral agreement at the April 2005 meeting or in any of their communication before the meeting. He testified that he did not tell the Nelsons at the April 2005 meeting that oral contracts were not enforceable in Illinois. He further testified that, in April 2005, he understood that an oral agreement for the sale of stock could be enforced in Illinois with adequate evidence. He acknowledged, however, at his deposition that he testified that he did not recall whether the Nelsons told him there was an oral agreement for $4.2 million or whether he told them it was not enforceable and to get the deal behind them.

¶ 91    On April 27, 2005, Nelson sent an email to Gatziolis, in which he stated that he and Curia began "this process" in September 2004. Nelson said that he and Curia met with Debes at Fifth

Third to discuss their needs and "came up with 4.2M of funds" and Debes approved that amount. Nelson stated that "[s]ince that was the figure we agreed that we needed, perhaps that would be the selling price including all the perks, etc[.], that [Curia] would be more comfortable with." Gatziolis forwarded the email to Shifflett and Cahill, and stated, "[f]ood for thought, although more like a fast."

¶ 92   On April 29, 2005, hours before Quarles & Brady filed the initial complaint in the district court, Nelson sent another email to Gatziolis in which he stated, among other things, that Fifth Third agreed to loan Curia "up to" $4.2 million to purchase his shares in both corporations. Nelson further stated that "[Curia] and I agreed along with the Bank that the [$4.2 million] would be about what the selling price would be." Nelson then identified the issues that he believed needed to be addressed going forward including the stock sale "which includes some type of Retirement Package."

¶ 93   Gatziolis testified that neither of these emails raised the question of an agreement in his mind because the words "perhaps" and "about" and the phrase "up to" suggested that Nelson and Curia had agreed approximately what the selling price would be, but did not indicate an agreement because these were not definite terms. Gatziolis testified that Nelson did not tell him at any point before Quarles & Brady filed the complaint in the district court that he and Curia had agreed on a selling price of $4.2 million. Gatziolis further testified that he knew from his prior experience that in order for a change of ownership for an automobile dealership to be approved, the owners would have to submit information to the automobile manufacturers. Gatziolis acknowledged, however, that he did not contact the automobile manufacturers to determine if they had documentation that would support a claim for an agreement between Nelson and Curia for $4.2 million.

¶ 94    Gatziolis testified that throughout the representation, his understanding was that Nelson would not settle unless he obtained the selling price he was looking for the shares and a retirement package. Gatziolis encouraged Nelson to settle while the litigation was pending and testified that he allowed Nelson to determine his own offers for a selling price during the negotiations.

¶ 95    Gatziolis and Shifflett testified that the initial complaint was filed on April 29, 2005. Both testified that the purpose for filing the complaint was to have something pending in the court before the closing date on Curia's Option Exercises on May 2. Shifflett and Gatziolis testified that Shifflett handled the litigation while Gatziolis mostly handled the settlement negotiations. Shifflett testified that when he filed the complaint, he had the information in the Johnson Packet, the Directors' Resolutions, and the emails Nelson sent to Gatziolis on April 27 and April 29. Shifflett was unsure whether he had the letter from Fifth Third from November 2004, committing to the loan of $4.2 million, but in any event he testified that he did not ask Nelson about the letter before filing suit. Shifflett testified that none of the information he received before filing the complaint put him on notice to investigate a potential oral agreement between Curia and Nelson.

¶ 96    Shifflett testified that he did not believe he had a duty to investigate a potential oral agreement because Nelson's letters to Curia indicated that they were not in agreement. Shifflett also observed that Curia had not signed the Stockholders' Minutes, and at no point did Nelson say that he and Curia had an agreement to sell his shares for $4.2 million. Shifflett also knew that Nelson and Curia would be required to submit information to the automobile manufacturers in order to approve the sale, but he did not know what information they had submitted. When he

started working on the complaint, he asked Nelson to give him everything he had, but did not contact the manufacturers.

¶ 97     Shifflett testified that his primary goal in filing the complaint was not to force Curia to purchase Nelson's stock for $4.2 million, but was to defeat Curia's Option Exercises. Shifflett testified that he believed that if Curia's options were "knock[ed] out," Nelson would be able to negotiate the sale of his shares to Curia, but as long as the options existed, Curia would not negotiate. Shifflett believed Nelson's goal was to establish a purchase price for all the stock, with the addition of some added benefits, and not just for the stock alone.

¶ 98     Shifflett acknowledged that the complaint did not include a contention that Curia and Nelson had reached an agreement for Curia to buy Nelson's shares for $4.2 million. Shifflett testified that he believed there was insufficient evidence to support such a claim. Shifflett knew that Curia and Nelson had negotiated in the summer of 2004, but did not believe they had reached an agreement at any point. Like Gatziolis, Shifflett testified that the emails Nelson sent on April 27 and April 29 did not raise the possibility of an agreement because Nelson used words like "perhaps," "about," and "up to." Shifflett testified that he discussed the filings with Nelson and that Nelson never mentioned an oral agreement to sell his shares to Curia for $4.2 million.

¶ 99     Nelson conceded that he did not say anything about the oral $4.2 million agreement in the Johnson Letter or the Johnson packet. He acknowledged that there was nothing about the agreement in the March 2005 letter to Curia that Gatziolis helped him write or in the July 2005 Ken's Story. Nelson further acknowledged that neither he nor Korey included any information about a July 2004 agreement or an oral agreement for $4.2 million when they edited the filings and returned them to Quarles & Brady.

¶ 100   After the district court granted Curia's motion for summary judgment, Nelson testified that he contacted Thomas at Toyota to ask for the purchase price that Curia included with his application. Thomas replied that the original agreement was for both Plaza and Mall and that Toyota's "understanding" was for a purchase price of $4.2 million. Nelson testified that he shared this information with Gatziolis and Shifflett in March 2006, but neither of them recalled receiving this information at that time.

¶ 101   Shifflett testified that the first time he received any communication about a potential oral agreement for $4.2 million was Nelson's email from August 29, 2006, after the district court had ruled on the summary judgment motions. Shifflett, however, did not believe that this email was definitive because Nelson said in the email that he sent the information about the agreement to the manufacturers, but Shifflett noted that Nelson's letters to the manufacturers did not include any information about a $4.2 million agreement. Shifflett had no reason to believe Nelson had sent any additional documentation to the manufacturers because Shifflett had previously asked Nelson to send him "everything." In addition, Shifflett testified that he believed Nelson still wanted all of his retirement perks and that he and Curia were still negotiating those items and had not actually reached an agreement. Shifflett testified that the information in this email did not create a sufficient basis to file an amended complaint alleging the existence of an oral agreement for $4.2 million.

¶ 102   Shifflett also acknowledged that he received emails from Korey in November and December of 2006, in which Korey stated that Curia agreed to purchase Nelson's shares for $4.2 million and that they discussed this agreement in the presence of Debes. Shifflett testified that he did not contact Debes for more information, because he believed Debes was biased toward Curia.

¶ 103   Debes testified that Nelson and Curia approached him in September 2004 about a request for a loan for Curia to purchase all of Nelson's shares in the two dealerships. Debes testified, however, that Nelson and Curia never told him that they had reached an oral agreement for the sale of the shares, but could not say whether Curia and Nelson had conversations between each other in which they reached an agreement. He testified that when generating the loan documents, he understood that Curia and Nelson were still negotiating toward a deal because they had differing views about what Curia would pay for the shares and what Nelson would accept for them. Debes testified that Fifth Third would not have disbursed the funds based on an oral agreement and would have also needed the manufacturers' approval before it would disburse the funds.

¶ 104   With regard to the November 2004 letter committing Fifth Third to the $4.2 million loan, Debes testified that the commitment letter provided that the funds would be issued for the purchase of Nelson's shares in Plaza and Mall, and that it would be inconsistent with Fifth Third's approval for Curia to use the funds for another purpose. He testified, however, that it was common in a situation like this one to get preapproval even before the final terms of the agreement were established. Debes acknowledged that he sent these loan documents to Toyota and Nissan at Curia's request. Debes also acknowledged that he cooperated with Curia's attorney during the Underlying Litigation because Fifth Third wanted Curia to become the owner of the dealerships.

¶ 105   Shifflett testified that, in early 2008, Nelson told him that he received information from Thomas at Toyota about a $4.2 million price, and Shifflett told him to get more information. Shifflett testified that he did not contact Thomas because he believed she would direct him to Toyota's legal department because he was a lawyer. On February 15, 2008, Quarles & Brady

filed an amended complaint in the district court, alleging that in 2004 Curia agreed to purchase Nelson's shares for $4.2 million. Shifflett said this allegation was based on the information from Nelson that Thomas had documentation reflecting a purchase price of $4.2 million. On March 20, 2008, Nelson emailed Shifflett to inform him that he asked Thomas when she received information from Curia that he was paying $4.2 million for the two dealerships. Nelson learned that Curia did not send a document to Toyota containing that information, but Thomas told him there was notation in her notes that the figure came from a communication with Curia that occurred in November 2004, before Thomas started in the position and Zangri was the Market Representation Administrator for Toyota.

¶ 106   Thomas testified that she had no personal knowledge of what happened between Zangri and Nelson or Curia. She testified that she likely would have had some documentation to support the $4.2 million figure in her email to Nelson, but she did not know where that amount came from. She testified that Toyota would have to know the purchase price of the shares in order to finalize the approval process. Zangri testified that in connection with the change of ownership for Plaza and Mall, Toyota received the Directors' Resolutions. Based on these documents, Zangri made an "assumption" that Curia had negotiated a deal to buy out Nelson's remaining shares. Zangri testified that he started the review process based on the information provided by Nelson and Curia and that he would not start that process unless there was an agreement that had been reached. He further testified, however, that in all the information Toyota received from Nelson or Curia, there were no terms of a deal or a price term. Zangri also testified that Toyota would not have approved the transaction based on the November 2004 loan commitment letter from Fifth Third because the loan agreement allowed shares of the dealership to be pledged to a

third party and allowed for the debt to be cross-collateralized, which ran afoul of Toyota standards.

¶ 107   Fariborz Nour testified at his deposition that he was the market representation specialist for Nissan in 2004 and 2005, and similarly testified that Nissan did not have documentation showing the purchase price or terms of an agreement between Nelson and Curia. He testified, however, that based on his experience, a request for the approval of a change of majority ownership interest would "not really get off the ground" without an asset or stock purchase agreement, but could not say whether such an agreement was provided in this case. Nour testified that he could not say whether Nissan required owners to provide a purchase price for the shares, but testified that it was not one of his requirements.

¶ 108                              a. Expert Witness Testimony

¶ 109   Joyce testified that based on the information Quarles & Brady had prior to filing the complaint, they should have been aware of a potential agreement between Curia and Nelson for the sale of Nelson's shares. Specially, Joyce testified that based on the Fifth Third letter from November 2004, it should have been "obvious" to Quarles & Brady to contact the bank and determine the purpose of the loan commitment. Joyce also observed that the Directors' Resolutions provided that Nelson would contact the manufacturers in connection with an agreement, which should have prompted Quarles & Brady to contact the manufacturers to determine what documentation they had related to the sale of the corporations' shares to Curia. Joyce testified that, in his opinion, a reasonably careful attorney under the circumstances would have conducted this investigation before filing the complaint. Joyce acknowledged, however, that the Directors' Resolutions did not refer to a $4.2 million agreement.

¶ 110  Joyce further testified that if Quarles & Brady had contacted Nissan and Toyota, they would have obtained documents that Curia had submitted to those manufacturers, which could have contained terms of the agreement and showed that Curia had been contacting the manufacturers in connection with a potential agreement. Joyce noted that Thomas told Nelson that her notes reflected that Curia told Toyota that he had agreed to purchase Nelson's shares for $4.2 million. He acknowledged, however, that Thomas could not provide any documentation supporting this statement, and that Thomas was not employed at that position at Toyota when the approval process started, so she had no personal knowledge of Curia's representations. Joyce also noted that there were documents that Nissan had sent to Nelson and Curia that stated that Nissan had approved the stock purchase agreement between Nelson and Curia. He further opined that Quarles & Brady would have learned from the manufacturers that they will not start processing an approval for a sale of a majority ownership interest until they are satisfied there has been an agreement between the parties.

¶ 111  Joyce further testified that if Quarles & Brady had undertaken this investigation, they would have learned that Nelson's goal in retaining them was to sell all of his shares of stock in the two dealerships for $4.2 million. Based on their investigation, Quarles & Brady should have informed Nelson that he had an enforceable oral contract between him and Curia for the sale of his shares in the two dealerships for $4.2 million. Joyce testified that Nelson would have had a very strong claim for breach of oral contract against Curia based on the evidence from Fifth Third that it had committed to the $4.2 million loan and the information from the manufacturers that they had been asked to approve a sale of Nelson's majority interest to Curia.

¶ 112  With regard to the retirement benefits, Joyce testified that Nelson believed that he had a deal for these benefits, but Curia did not. Joyce opined that whether those benefits were part of

the stock sale agreement would be reserved for the trier of fact. Nonetheless, Joyce testified that these benefits had no relevance to the stock sale for $4.2 million because Curia and Nelson viewed them as separate transaction. Joyce noted that both parties continued to process the sale by contacting the manufacturers and Fifth Third even after Curia did not sign the Stockholders' Minutes, which outlined the retirement benefits. Joyce did not believe the perks were a condition of the stock sale agreement.

¶ 113   Joyce also testified that Gatziolis, in telling Nelson that oral contracts are not enforceable in Illinois, did not perform as a reasonably careful lawyer under the circumstances. Joyce noted that the two emails Nelson sent to Gatziolis on April 27 and April 29, 2005, should have provoked Gatziolis to speak to Fifth Third to determine the purpose of the loan. After investigating Fifth Third and the manufacturers, Gatziolis should have interviewed Nelson and would have learned about Nelson's goals and his attempts to continue the approval process with the manufacturers after Curia reneged. Joyce testified that Gatziolis should have directly asked Nelson for any documents related to the sale of stock to identify other potential sources of information that would help him determine Nelson's rights and obligations.

¶ 114   Joyce testified that Quarles & Brady should have included an argument regarding the $4.2 million oral contract in the complaint because merely defeating the stock options, as Quarles & Brady sought to do with the complaint, would not have achieved Nelson's goal; Nelson still would have retained his ownership interest in the dealerships if he had prevailed. An argument that he and Curia had entered into an oral agreement to sell Nelson's shares for $4.2 million, however, would have achieved Nelson's goal if he had prevailed. Joyce opined that, based on the documentation and testimony available to Quarles & Brady, it was more likely true than not that Nelson would have prevailed on the argument that he had a valid and enforceable

oral contract with Curia for the sale of his shares for $4.2 million if Quarles & Brady had raised that argument before the district court. Joyce concluded that Quarles & Brady's failure to assert this argument demonstrated Quarles & Brady's failure to perform as a reasonably careful lawyer under the circumstances.

¶ 115  DiVito testified that, in his opinion, Quarles & Brady used the experience, skill, and knowledge that a reasonably careful lawyer would use under the circumstances. He testified that Quarles & Brady was entitled to rely on the information provided to them by Nelson in the Johnson Letter, and the other documents Nelson submitted to Quarles & Brady. DiVito opined that this documentary evidence, as well as the other information Nelson provided to Quarles & Brady, did not support a claim for an oral agreement. DiVito noted that in the documentation that he reviewed in preparation for his testimony, he did not see any contemporaneous evidence that referenced, documented, or confirmed the alleged oral agreement. DiVito testified that, instead, the documentation indicated that, from the beginning, Nelson was "bemoaning" that Curia would not negotiate with him and declined all of his offers. DiVito testified that if Nelson and Curia had reached an oral agreement, Nelson would be "screaming it from the rooftops" and not saying that Curia had not accepted his offers. DiVito testified that Quarles & Brady did not have a duty to interview Nelson about a potential oral agreement because they did not have any information regarding the possibility of the existence of such an agreement in 2005. DiVito testified that Gatziolis' testimony and the documentary evidence indicated that Gatziolis may have known about the loan commitment from Fifth Third and the negotiations between Nelson and Curia, but he had no reason to know about any oral agreement.

¶ 116  DiVito further testified that Quarles & Brady had no duty to contact the automobile manufacturers because they already had all of the information from Nelson. Quarles & Brady

had no reason to suspect that there was an oral agreement because all of the information they had from Nelson indicated there was no agreement. DiVito testified that Quarles & Brady also had no duty to contact Fifth Third. DiVito concluded that, at the time the complaint was filed, there was no evidence to allege the existence of an oral agreement for $4.2 million and the arguments Quarles & Brady made in the complaint were reasonable in an attempt to defeat Curia's Option Exercises. DiVito noted that the evidence showed that Quarles & Brady did not become aware of a potential oral agreement until the second half of 2006, after the district court had already ruled.

¶ 117                    4. *The Circuit Court's Ruling*

¶ 118   The circuit court delivered its judgment in a written order. In its order, the circuit court recounted the testimony of Joyce and found that the evidence presented failed to show that Quarles & Brady was aware, before filing the lawsuit in the district court on April 29, 2005, that Nelson believed he had reached an oral agreement for the sale of his shares only for $4.2 million. The court continued that even after Quarles & Brady filed the lawsuit, Nelson's continued communication with Quarles & Brady did not reveal such an agreement. Instead, the court found that the evidence suggested that Nelson desired to reach an agreement with Curia, made efforts in furtherance of a sale, and negotiated over terms, but ultimately did not reach an agreement with Curia. The court determined that it only became clear after the district court ruled that Nelson was claiming that he had reached an enforceable oral agreement with Curia. Ultimately, the court determined that "[w]hen segregating the evidence of what [Quarles & Brady] was told, or learned over time, from the evidence which would have been admissible at a trial for breach of contract, it becomes clear that plaintiff has failed to establish that it is more likely than not that Nelson would have won that breach of contract case." The court therefore determined that Nelson had failed to establish the proximate cause element of his legal malpractice claim.

¶ 119   The court further found that Nelson had failed to establish negligence with regard to his claims that Quarles & Brady should have argued that Curia's Option Exercises were invalid because they were not the mirror image of the 1989 SPA options and that the written agreements were ambiguous. The court determined that Quarles & Brady's positions could not judged by their outcome, but rather should be judged by whether Quarles & Brady deviated from the standard of care. The court further found that Nelson failed to establish proximate cause with regard to Quarles & Brady's failure to raise those arguments because, after the Seventh Circuit reversed and remanded the case, Nelson elected to settle with Curia and thus forfeited his right to pursue further litigation on remand. Nelson now appeals.

¶ 120                                II. ANALYSIS

¶ 121   On appeal, Nelson contends that the circuit court erred in rejecting his legal malpractice claim where the evidence overwhelming showed that Nelson and Curia entered into an oral agreement for Curia to purchase Nelson's stock for $4.2 million and that Quarles & Brady was aware of the agreement by the time it filed the complaint in April 2005. Nelson contends that the court erred in rejecting his claim that Quarles & Brady was negligent for failing to assert this claim in the district court. Nelson further contends that the court erred in rejecting his claim that Quarles & Brady deviated from the standard of care by failing to argue that Curia's Option Exercises were defective because they were not the mirror image of the options in the 1989 SPA. Nelson also asserts that the court erred in rejecting his claim that Quarles & Brady deviated from the standard of care by failing to argue that the written agreements were ambiguous. Finally, Nelson contends that the court erred in finding that Quarles & Brady's negligence was not the proximate cause of his damages.

¶ 122                    A. Standard of Review

¶ 123  To prevail on a claim of legal malpractice, a plaintiff must show (1) an attorney-client relationship, (2) that the defendant attorney owed the plaintiff client a duty of care arising out of that attorney-client relationship, (3) that the defendant attorney breached that duty, and (4) that the plaintiff client suffered injury as a proximate result of the defendant attorney's breach. *Warnock v. Karm Winand & Patterson*, 376 Ill. App. 3d 364, 368 (2007) (citing *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 306 (2005)). In order to establish proximate cause in a legal malpractice action, the plaintiff client must essentially prove "a case within a case," *i.e.*, that "but for" the attorney's negligence, the plaintiff would have prevailed in the underlying action. See *First National Bank of LaGrange v. Lowrey*, 375 Ill. App. 3d 181, 196 (2007). The injury in a legal malpractice action is not a personal injury, or the attorney's negligent act itself, but is a "pecuniary injury to an intangible property interest caused by the lawyer's negligent act or omission." *Northern Illinois Emergency Physicians*, 216 Ill. 2d at 306.

¶ 124  As both parties recognize, generally, the standard of review in a bench trial for a legal malpractice action is whether the court's judgment was against the manifest weight of the evidence. *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002); *Kalata v. Anheuser-Busch Cos.*, 144 Ill. 2d 425, 433 (1991). "A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner*, 202 Ill. 2d at 252. On review, we will not substitute our judgment for that of the trier of fact. *Id.*

¶ 125  Despite acknowledging this general rule, Nelson nonetheless contends that this court should not accord the circuit court's ruling any deference. Nelson asserts that, in its order, the

circuit court did not make any specific factual findings and that aspects of its decision were contrary to uncontested facts and documentary evidence. Nelson contends that, as such, we should not defer to the court's judgment, which ignores the uncontradicted testimony at trial and the documentary evidence establishing the oral $4.2 million stock purchase agreement. Nelson further maintains that this court should review *de novo* the trial court's ruling that Nelson failed to prove the proximate cause element of his claim because he settled the Underlying Litigation after the Seventh Circuit's remand because this finding was "incorrect as a matter of law."

¶ 126                    1. *The Manifest Weight Standard Applies to this Action*

¶ 127   Contrary to Nelson's contentions, the deference afforded to the trial court under the manifest weight of the evidence standard is not applied only where the circuit court makes specific factual findings and credibility determinations *on the record*. Rather, we give deference to the circuit court because it is in the best position to observe the conduct and demeanor of the parties and the witnesses, and is intimately familiar with the evidence. *Best v. Best*, 223 Ill. 2d 342, 350 (2006); *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002). Here, it is apparent from the record that the court was required to make credibility determinations and factual findings in determining when Quarles & Brady knew about Nelson's claim that he entered into an oral agreement with Curia for the sale of his shares, given the contradictory testimony that was presented on this issue by Nelson, Korey, Gatziolis, Shifflet, and others, as well as the documentary evidence presented. It would defy this court's function to hold that we should not defer to the circuit court's determination on these matters because they were not made on the record. Instead, on review, we should not substitute our judgment for that of the circuit court regarding the credibility of the witnesses, the weight to be given the evidence presented, or the inferences to be drawn from that evidence. *In re D.F.*, 201 Ill. 2d at 499. In addition, as discussed in detail below, we cannot say

that the evidence presented regarding the oral stock purchase agreement was "uncontradicted," as Nelson suggests.

¶ 128   We are not persuaded by the precedent cited by Nelson, *Chicago Investment Corp. v. Dolins*, 107 Ill. 2d 120 (1985), and *Long v. Arthur Rubloff & Co.*, 27 Ill. App. 3d 1013 (1975). In neither case did the court hold that a reviewing court should not defer to the findings of the circuit court where the circuit court failed to make specific factual findings and credibility determinations on the record. In *Chicago Investment Corp.*, the supreme court did not find that trial court had an "obligation" to make factual findings on the *record*, but merely stated that where the trial court is the finder of fact, it has the obligation to make such findings. *Chicago Investment Corp.*, 107 Ill. 2d at 124. Similarly, in *Long*, this court specifically found that such factual findings are "not required" to be on the record, but merely stated that it would be "better practice" for the trial court to set forth the reasons for its judgment. *Long*, 27 Ill. App. 3d at 1022 n.4. We express no opinion regarding whether such a procedure would be "better practice," but we observe that our precedent is clear that a trial court is not required to state the reasoning for its judgment on the record in order for the manifest weight of the evidence standard to apply and for this court to accord deference to its credibility and factual findings. Here, it is clear from the evidence presented that the circuit court was required to make certain credibility and factual determinations, and our well-established precedent directs us to accord deference to such determinations, whether or not the court explains the reasoning for its determinations or whether or not such determinations are made on the record. Accordingly, we will review the court's ruling to determine whether its judgment was against the manifest weight of the evidence.

¶ 129                                    B. $4.2 Million Oral Agreement

¶ 130   Nelson first contends that evidence presented at trial established that Nelson and Curia entered into an oral agreement for Curia to purchase Nelson's stock for $4.2 million and that Quarles & Brady was aware of that agreement before it filed the complaint in April 2005. Nelson asserts that there is overwhelming evidence of the agreement from the testimony of both Curia and Nelson, their conduct after the oral agreement, the documentary evidence, and the testimony of third parties. Nelson contends that the circuit court's determinations that Quarles & Brady did not know about the oral agreement before the district court ruled and that Nelson presented insufficient evidence to show that he would have prevailed on a breach of contract claim based on the $4.2 million oral agreement was against the manifest weight of the evidence.

¶ 131   1. *The Circuit Court's Ruling that Quarles & Brady Did Not Know About Nelson's Claim for a $4.2 Million Oral Agreement Before the District Court Ruled[1] Was Not Against the Manifest Weight of the Evidence*

¶ 132   Here, the evidence presented at trial shows that when Nelson approached Quarles & Brady in March 2005, he was seeking legal advice with regard to his rights after Curia's Option Exercises. None of the documentation Nelson submitted to Quarles & Brady at that time included information that would indicate that he and Curia had entered into an oral agreement for the sale of his shares for $4.2 million. In fact, in the Johnson Letter, Nelson specifically stated that he approached Curia in September 2004 about purchasing his stock with "some conditions," but he and Curia met in January 2005 and realized they "were not in agreement with either the

---

[1]Nelson contends that in its written order, the circuit court focused on whether Quarles & Brady knew about the oral agreement before *filing the complaint* in April 2005, where the relevant inquiry should have been whether Quarles & Brady knew about Nelson's claim before the district court ruled on the motions for summary judgment. However, the circuit court's order reflects that it also considered that "[e]ven after the lawsuit was filed, ongoing discussions and receipt of emails and documents never revealed such a claim from Nelson." The court also found that "at no time before the lawsuit was filed, or *until after the district court ruled*, did it become clear that Nelson was making the claim that an enforceable oral agreement existed since 2004." (Emphasis added.)

purchase price or its application." Although Nelson stated that funding was "available" for the stock sale through Fifth Third, Nelson did not state that he and Curia had reached an agreement and that Curia had reneged.

¶ 133   Similarly, none of the documents in the Johnson Packet would indicate to Quarles & Brady that Nelson and Curia had entered into an oral agreement for the sale of Nelson's shares sometime in 2004. Like the Johnson Letter, the Chronology makes no reference to a $4.2 million oral agreement, and, in fact, Nelson stated that there was "no reason" for him to send letters to the manufacturers of his "wish" to sell until they had put together a retirement package. The Stockholders' Minutes likewise lack any detail about an oral agreement for the sale of Nelson's shares and, in any event, are not signed by Curia.

¶ 134   We observe that there was some discussion at trial, and in the briefs before this court, regarding whether Shifflett and Gatziolis had the Directors' Resolutions before filing the complaint. Whether or not Quarles & Brady had these documents before the district court ruled, however, does not change our conclusion. The Directors' Resolutions simply stated that the stockholders would accept an agreement whereby "[Nelson] would sell his 8000 shares in this corporation (52.7%) to [Curia], and that the manufacturers [would] be contacted to facilitate the transaction." At trial Nelson testified that the "agreement" referred to in the Directors' Resolutions was the same agreement referenced in the Stockholders' Minutes. The Stockholders' Minutes provided that it was "resolved that the following conditions of the sale and transfer of stock from [Nelson] to [Curia] be approved by the Board of Directors." The Stockholders' Minutes then listed nine conditions, the first of which provided that the sale of the stock to Curia be in accord with the 1989 SPA. Gatziolis acknowledged that the Directors' Resolutions may have put him on notice of an agreement between Curia and Nelson for the sale of shares, but

referred to the Stockholders' Minutes, which were dated the day before and not signed by Curia. Thus, Gatziolis had no reason to believe that there had been an agreement between Nelson and Curia. Again, neither the Stockholders' Minutes nor the Directors' Resolutions contain any reference to an oral agreement for $4.2 million.

¶ 135   We also find the November 2004 commitment letter from Fifth Third was insufficient to put Quarles & Brady on notice of an oral agreement between Nelson and Curia. The letter does not refer to an agreement, but provides that Fifth Third was committed to lend Plaza $4.2 million to provide Curia with sufficient funds to buy out Nelson's ownership interest in Plaza and Mall. In examining this document, Quarles & Brady could rely on the information provided by Nelson in the Johnson Letter that, although funding for a stock sale was "available" from Fifth Third, Nelson and Curia had not reached an agreement. This letter must also be viewed in context with the other information Nelson provided to Quarles & Brady. For example, on April 27 and 29, 2005, Nelson emailed Gatziolis to provide some context for the Fifth Third commitment letter. In both emails, Nelson stated that Fifth Third agreed to loan $4.2 million and that would "perhaps" be the selling price, and it would be "about" what Curia needed to purchase his shares. Gatziolis testified that this uncertain language did not put him on notice of any agreement between the parties. Also, in both emails, Nelson indicated that the agreement for the sale of shares included a retirement package or "perks." The previous documents Nelson had provided to Quarles & Brady, including the Chronology and the Stockholders' Minutes, unequivocally showed that Curia had not agreed to provide a retirement package, and thus would indicate to Quarles & Brady that there had been no agreement between the parties.

¶ 136   Similarly, the record shows that while drafting the complaint, Quarles & Brady sent drafts to Nelson and Korey for their review. In revising the complaint, Nelson and Korey

specifically amended sections of the complaint to provide that Nelson had approached Curia about selling his shares, but that Curia did not accept any of Nelson's offers. Again, in July 2005, Nelson sent Ken's Story to Quarles & Brady in which he again stated that he had approached Curia with an offer to buy his shares, but Curia had not accepted his offers and had refused to even make a counteroffer. Nelson contends that he stated that Curia did not accept any of his offers because he was relying on Gatziolis' legal advice that oral contracts were not enforceable in Illinois. However, it is a different matter for Nelson to state that Curia orally accepted his offer, but that it is not enforceable, than it is for Nelson to say that Curia did not accept his offers. Moreover, Nelson indicated in various documents, including the Chronology, that Curia did not accept his offers to sell his shares even before the April 20, 2005, meeting where Nelson claims Gatziolis told him that oral agreements were not enforceable in Illinois.

¶ 137   In short, every documented communication Nelson had with Quarles & Brady until after the district court's ruling suggested that Nelson had approached Curia with offers to sell his shares, but Curia had not accepted. As DiVito testified, if Nelson and Curia had reached an oral agreement, Nelson would be "screaming it from the rooftops" and not saying that they had not reached an agreement. Despite Joyce's testimony that the information Nelson provided to Quarles & Brady should have put them on notice of the oral agreement, given the abundant evidence presented suggesting that Curia and Nelson had not reached an agreement, we cannot say that the circuit court's ruling was against the manifest weight of the evidence.

¶ 138   Nelson contends, however, that he, Carol, and Korey each testified that at the April 20, 2005, meeting, Nelson told Gatziolis about the oral agreement and Gatziolis told him that it was not enforceable in Illinois. Nelson asserts that the court "completely ignored" this testimony in rejecting his claim. The court's order suggests, however, that the court did not ignore this

testimony, but instead accepted Gatziolis' testimony that Nelson did not tell him about the oral agreement at the meeting, and that Gatziolis did not tell Nelson that oral agreements are not enforceable in Illinois. Nelson asserts that this testimony contradicted Gatziolis' testimony at his deposition where he stated that he could not recall whether Nelson told him about an oral agreement; however, this apparent contradiction created a credibility determination that was within the province of the circuit court to resolve. As discussed, we defer to the judgment of the circuit court on these issues because the circuit court is in the best position to observe the conduct and demeanor of the parties and the witnesses. *Best*, 223 Ill. 2d at 350. The court's order implicitly suggests that it accepted Gatziolis' testimony on this issue and did not accept the testimony of Nelson, Carol, and Korey. We cannot say, based on the record before us, that such a determination was against the manifest weight of the evidence.

¶ 139   Nonetheless, Nelson asserts that Gatziolis' testified at trial he was "generally" aware in April 2005 that Nelson and Curia had entered into an oral agreement for the sale of Nelson's shares for $4.2 million and Curia had reneged. Nelson contends that the trial court's ruling is therefore impossible to sustain in light of this admission. To support this contention, however, Nelson relies on testimony that was taken out of context and that Gatziolis later clarified. At trial, Nelson's counsel asked Gatziolis about a letter Nelson had written to Debes that Gatziolis reviewed in April 2008.

> "Q. And what it says here is: You [(Debes)], [Curia] and I met at the corporation offices in Dixon, Illinois in September of 2004 at which time Mr. Curia and I asked Fifth Third Bank to loan Mr. Curia our agreed upon purchase price of *** 4,200,000 for my shares in the two corporations. On November 4th, 2004 we received your commitment letter stating that you would loan Rick Curia 4,200,000 to purchase my shares in Auto

Plaza and Auto Mall. The stock *** purchase was to close by year-end, but Mr. Curia reneged on our agreed price as stated in your letter.

* * *

Q. This was the same thing Mr. Nelson told you from the time you first met with him back in April of '05, isn't it?

A. That he attempted to sell the stock, yes.

Q. Sir, the information that's in here. Isn't this precisely the information Mr. Nelson told you back in April of '05?

A. There may not have been all this detail, but generally that's correct."

Later, Quarles & Brady's counsel asked Gatziolis about his testimony regarding the letter.

"Q. At any time up to the time this complaint was filed on the next to last day of April 2005, had Mr. Nelson ever told you that he had reached an oral agreement that Mr. Curia had agreed to buy his shares and his shares only for $4.2 million?

A. No, he did not.

Q. Had he said something like that to you, is that something you would have recalled?

A. It would be."

Viewed in light of Gatziolis' other testimony, the portion highlighted by Nelson does not support his contention that Gatziolis admitted that he knew about the oral agreement for $4.2 million and that the trial court ignored that testimony. As Gatziolis testified, he "generally" knew the information in the letter, *i.e.*, that Nelson wanted to sell his shares to Curia and that Fifth Third agreed to loan the money for the purchase, but he denied that Nelson ever told him that he and

Curia had reached an agreement for the sale of his shares, which was consistent with his other testimony on this issue.

¶ 140  Nelson also points to another portion of Gatziolis' testimony that he contends constitutes an admission by Gatziolis that he knew about the oral agreement for $4.2 million in April 2005. After Gatziolis' testimony clarifying his earlier testimony about the letter, Nelson's counsel's asked Gatziolis:

> "Q. I think you told us earlier today that right from the very beginning of your relationship or your meetings with Mr. Nelson, he basically told you what was in that last letter about having had a $4.2 million agreement and Mr. Curia reneged on it. Remember that testimony from this morning?
>
> A. Yes."

This testimony does not constitute an admission by Gatziolis that he knew about the $4.2 million agreement as Nelson contends, but is rather Gatziolis acknowledging that he recalled his testimony on this subject matter from earlier that day. Viewed in light of Gatziolis' unequivocal testimony that Nelson did not tell him about the $4.2 million oral agreement, we cannot say that the portions of the Gatziolis' testimony identified by Nelson render the trial court's ruling contrary to the manifest weight of the evidence.

¶ 141  Nelson next contends that, in 2007 and 2008, Quarles & Brady filed pleadings in the district court asserting that Curia and Nelson had entered into a $4.2 million oral agreement in 2004. Nelson asserts that the evidence shows that Quarles & Brady did not have any additional information about the oral agreement at that time than it did when the original complaint was filed in April 2005. This is demonstrably false. The evidence shows that after the district court ruled in 2006, both Nelson and Korey emailed Shifflett to inform him about the $4.2 million oral

agreement. Nelson emailed Shifflett in August 2006, stating that he and Curia negotiated and agreed to a price of "4.2m (stock only, both corps)," but then Curia decided that he did not want to pay that much. Shifflett testified that this email was the first time he had received any communication about a potential oral agreement for $4.2 million. Similarly, Korey emailed Shifflett in November and December 2006 and stated that in November 2004, Nelson, Curia, and Debes "had a meeting where [Curia] agreed to pay 4.2 million [for] the stock." Korey suggested that Quarles & Brady add such a claim to the impending motion. In addition, Shifflett testified that in early 2008 Nelson told him about an email he had received from Thomas where she stated that it was Toyota's understanding that the stock purchase agreement included both Plaza and Mall and was for $4.2 million. Thus, the record shows that Quarles & Brady had significantly more information about a potential oral agreement in 2007 and 2008 than it did when it filed the original complaint in April 2005 or by the time the district court ruled in February 2006. Accordingly, we find that the circuit court's holding that Quarles & Brady did not know about Nelson's claim for a $4.2 million oral agreement before the district court ruled was not against the manifest weight of the evidence.

¶ 142   2. *The Circuit Court's Finding that Nelson Failed to Prove that it Was More Likely Than Not that Nelson Would Have Prevailed on a Breach of Contract Claim for the $4.2 Million Oral Agreement Was Not Against the Manifest Weight of the Evidence.*

¶ 143   Although we have already found that the circuit court did not err in ruling that Quarles & Brady did not know about the oral agreement for $4.2 million before the district court ruled, we also find that even if Nelson had shown that Quarles & Brady did know about the agreement, his legal malpractice claim would nonetheless fail because he failed to establish the proximate cause element of this claim. That is, Nelson has failed to establish the "case within a case" aspect of his legal malpractice action. See *Orzel v. Szewczyk*, 391 Ill. App. 3d 283, 290 (2009). Nelson's claim

is fundamentally that he would have prevailed on a breach of oral contract action against Curia if Quarles & Brady had properly investigated and raised the claim of an oral agreement in the Underlying Litigation. In order prevail on a claim for breach of contract, a plaintiff must prove (1) the existence of a contract, (2) the performance of the conditions precedent, (3) breach by defendant, and (4) damages as result of the breach. *Van Der Molen v. Washington Mutual Finance, Inc.*, 359 Ill. App. 3d 813, 823 (2005). Here, Nelson has failed to establish even the existence of a contract.

¶ 144   In contending that he would have succeeded on a breach of contract claim in the Underlying Litigation, Nelson asserts that the uncontradicted evidence shows that he and Curia entered into an enforceable oral agreement for the sale of his shares only for $4.2 million. He maintains that the agreement for retirement benefits or "perks" was a separate agreement, and not a condition to the stock sale agreement. Nelson asserts that Curia's testimony and contemporaneous conduct, Joyce's testimony, and the evidence available from the automobile manufacturers and Fifth Third demonstrates that he would have prevailed on this claim in the district court if Quarles & Brady had investigated and raised this claim.

¶ 145                               a. Agreement for Shares Only

¶ 146   As a threshold matter, we observe that the record does not support Nelson's contention that the oral agreement Nelson contends existed was for the "stock only" and that the retirement benefits or perks were a separate agreement. Nelson contends that the oral agreement for the sale of Nelson's shares for $4.2 million was already in existence when Nelson approached Curia regarding the retirement benefits. Thus, Nelson contends that Curia's refusal to provide the retirement benefits has no bearing on Curia's acceptance of the stock sale agreement. Nelson

asserts that the documentary evidence and Curia and Nelson's testimony support his claim that the agreements were separate.

¶ 147  However, Nelson's own statements support the proposition the stock purchase agreement and the retirement benefits or perks agreement was one agreement. For instance, in the Chronology, Nelson stated Curia had been "difficult" in extending to him the things he needed for retirement and putting together a "retirement package." Nelson stated that he would be contacting the manufacturers even though there was "no reason" for him to send a letter of his "wish to sell until we have a [retirement] package put together." In Curia's response, he stated that he did not see anywhere in their "agreement" that he was required to provide Nelson with a retirement package. Curia testified that he was referring to their written agreements. Similarly, in the Johnson Letter, Nelson stated that when he approached Curia about selling his shares, he "gave him some conditions at that time *for* the purchase" (emphasis added), which included most of the nine items listed in the Stockholders' Minutes. Again, in the March 14, 2005, letter Nelson sent to Curia, Nelson stated that in August 2004 he offered Curia the opportunity to purchase his stock in Plaza and Mall "upon certain terms and conditions" that were set forth in a letter Nelson left on his desk on December 3, 2004. Nelson represented that those terms and conditions were that the October 6, 2004, Stockholders' Minutes, which outlined Nelson's retirement package, be signed by both parties, that the newly agreed leases for the properties owned by CRANK be signed by both parties, and that the September 30, 2004, GM financial statement be used for the sale price.

¶ 148  Nelson reiterated that the stock sale offer and the retirement package were one agreement in his subsequent correspondences with Quarles & Brady. For instance, in Nelson's April 27, 2005, email to Gatziolis, Nelson stated that the $4.2 million figure would "perhaps being the

selling price *including all the perks.*" (Emphasis added.) Similarly, in Nelson's April 29, 2005, email to Gatziolis, Nelson identified the issues that he believed needed to be addressed, including a "Stock Sale which *includes some type of Retirement Package.*" (Emphasis added.) Again, in a September 17, 2005, email to Shifflett, Nelson stated that when he approached Curia about retiring in July 2004, he put together a retirement package. In fact, both Gatziolis and Shifflett testified that they believed that Nelson would not accept a settlement offer or sell his shares without a retirement package. Nelson's correspondences support that conclusion. Nelson did not indicate his belief that the purported oral agreement was for the sale of stock only until his email to Shifflett and Cahill on August 29, 2006. Even in that email, Nelson stated that when he and Curia began negotiating in 2004, they used the 2000 agreement as "base" and then "began adding other perks."

¶ 149   The fact that Curia did not sign the Stockholders' Minutes is further evidence that the proposed stock sale and the retirement package were one agreement. The Stockholders' Minutes were prepared one day before the Directors' Resolutions, which Curia did sign, and contained the conditions of Nelson's "retirement package." Curia testified that he did not sign the Stockholders' Minutes because he "agreed to buy the stock but not all the additional conditions that were listed." Nelson also testified that Curia refused to sign the Stockholders' Minutes because Curia believed it was "too much." Clearly, if both Curia and Nelson believed that there was already an agreement for the sale of stock alone, the parties would have followed through on the stock purchase and handled the retirement package in a separate agreement. Instead, the evidence suggests that Nelson conditioned the stock sale on Curia providing a retirement package and Curia did not agree to those terms. In any event, the circuit court's determination that the proposed stock sale and retirement package were one agreement was not against the

manifest weight of the evidence, given the ample evidence discussed above indicating that they were one agreement. Accordingly, we find that the circuit court did not err in finding that Nelson would not have prevailed on a breach of contract claim in the Underlying Litigation where the evidence shows that Nelson's offer to Curia was to purchase the stock and provide a retirement package, and Curia did not accept. Even if we were to find that Nelson had adequately proved that the purported oral agreement was for the sale of his stock only, we would nonetheless find that Nelson failed to establish that it would be more likely than not that he would succeed on this claim before the district court for the reasons discussed below.

¶ 150                     b. Curia's Testimony and Contemporaneous Conduct

¶ 151   Nelson first contends that Curia acknowledged at trial that he entered into an agreement with Nelson for the sale of the shares only, and his contemporaneous conduct at the time of the agreement represents evidence of the agreement. Nelson points to Curia's testimony regarding his perception of their agreement in October 2004, at the time they signed the Directors' Resolutions.

"Q. So by the time you signed [the Directors' Resolutions] *** you know what it was at that time?

A. Sure.

Q. And then you told us that you proceeded after, so you had an agreement as of that date to buy the shares only?

A. I believed I had an agreement."

Curia's testimony illustrates that at the time he signed the Directors' Resolutions, he believed that he had an agreement to buy Nelson's shares for a "sum certain." Nelson contends that this constitutes an admission by Curia that they had entered into an agreement for the purchase of

Nelson's stock only. Under questioning from Quarles & Brady's counsel, however, Curia testified that the agreement that he believed was in place at the time he signed the Directors' Resolutions in October 2004 was an agreement under the terms of the 1989 SPA and the "written agreements that [they] had *** in place for years," *i.e.*, the 1989 SPA, the 1993 Modification, and the 2000 Agreement. In fact, when asked directly about the oral agreement, Curia denied that he had ever accepted to buy Nelson's shares for $4.2 million.

"Q. And, sir, is it true that at no time in the year 2004 did you ever agree to pay Mr. Nelson $4.2 million for his shares as an agreement, an oral agreement, separate from what the 1989 stock purchase agreement was?

A. Absolutely never."

¶ 152 Curia's contemporaneous conduct also does not support Nelson's contention that he and Curia entered into an oral agreement for the purchase of Nelson's shares only. First, the Fifth Third commitment letter does not serve as proof of an oral agreement. Curia testified that he intended to use the funds to purchase Nelson's shares pursuant the 1989 SPA and for working capital or to pay off other loans. Debes testified, however, that based on the terms of the loan commitment, Curia could use the funds only to purchase Nelson's shares. He testified, however, that when he met with Curia and Nelson in September 2004, he understood that they had not reached an agreement and that they were still negotiating toward a deal because they had different views about an acceptable price for the shares. Debes testified that it was common in a situation like Curia and Nelson's for one party to get preapproval for a loan before the final terms of the agreement were established. Thus, Curia applying for and receiving a loan commitment from Fifth Third does not serve as proof of an oral agreement.

¶ 153   Similarly, Curia's contact with the automobile manufacturers does not indicate that the parties entered into an oral agreement. Nelson contends that the record shows that Curia submitted documentation to the automobile manufacturers for approval of the agreement demonstrating that they had, in fact, reached an agreement. However, the record shows that Curia began submitting documentation in anticipation of exercising his 1989 SPA options. Curia sent his response to the Chronology on November 4, 2004, indicating his intent to exercise his options. That same day he received the loan commitment letter from Fifth Third. On November 3, 4, and 10, Curia submitted documentation to the automobile manufacturers, including the Toyota Minimum Standards, the Toyota Dealer Performance Evaluation, Dealer Biographical Information, and an Application for Nissan Dealer Sales and Service Agreement. On November 4, 2004, Curia also submitted an Investment Proposal Summary to GM, to which he attached the letter from Fifth Third committing to the $4.2 million loan. Curia's contemporaneous conduct therefore suggests that there was no previous agreement, and that he started seeking manufacturer approval only after he notified Nelson of his intent to exercise his options under the 1989 SPA. Thus, Curia's testimony and contemporaneous conduct does not support Nelson's contention that he would have prevailed on his claim for an oral agreement if it had been raised in the district court.

¶ 154                                    c. Joyce's Testimony

¶ 155   Nelson next contends that his expert, Joyce, testified that it was more probably true than not that Nelson would have won a breach a contract claim for breach of oral agreement if Quarles & Brady had pursued such a claim in the district court. Joyce acknowledged that at his deposition he opined that Nelson's odds of success on this claim were "60/40." Nelson claims that Quarles & Brady failed to elicit an opinion from their expert, DiVito, on this issue and

"effectively conceded" Joyce's opinion that Nelson would have prevailed. The record shows, however, that Quarles & Brady did, in fact, elicit an opinion from DiVito on this subject, and his opinion contradicted Joyce's.

"Q. Sir, do you have an opinion whether the documentary information provided to Quarles and Brady by Mr. Nelson demonstrated approvable [*sic*] oral agreement for the sale of those shares?

\* \* \*

A. That the documents do not establish such an agreement.

Q. What is that opinion based on?

A. From the very beginning before [Quarles & Brady] even talked to [Nelson], he was bemoaning the fact that Curia would not negotiate with him, that he said no to everything. And although he continued negotiating, he never agreed to anything and there is no reference whatsoever to a specific oral agreement."

Thus, DiVito did contradict Joyce's testimony on this issue, testifying that the evidence did not show a provable oral agreement for the sale of the shares, *i.e.*, that Nelson would not have prevailed on this claim before the district court. It is well settled that " '[a]s the trier of fact, the judge may accept one expert opinion over another.' " *Robrock v. County of Piatt*, 2012 IL App (4th) 110590, ¶ 42 (quoting *City of Marseilles v. Radke*, 307 Ill. App. 3d 972, 977 (1999)). Here, the circuit court plainly accepted DiVito's testimony on this issue. Such a decision was within the discretion of the circuit court, and we cannot say, based on Joyce's testimony and the other evidence presented, that the circuit court's ruling was against the manifest weight of the evidence.

¶ 156                    d. Automobile Manufacturers

¶ 157   Nelson next contends that the evidence provided by the automobile manufacturers proved the existence of the oral agreement for $4.2 million. Nelson asserts that the evidence demonstrates that in October 2004, *both* Nelson and Curia applied to the automobile manufacturers for approval of the stock sale. Nelson points out that both Zangri and Nour testified that the manufacturers will not process an application for the sale of shares unless the parties notify them that they have entered into an agreement. Nelson contends that the crucial piece of evidence demonstrating the existence of the oral agreement is Thomas's email to Nelson, in which she stated that her notes showed that Curia informed Toyota that he had reached an agreement to purchase Nelson's shares for $4.2 million.

¶ 158   At trial, Thomas acknowledged sending Nelson an email stating that the purchase price to Toyota's "understanding" was $4.2 million, but she acknowledged that she did not know the source of that figure. She testified that there would likely be some sort of documentation to support the information in her email, but she did not have a purchase agreement and had no personal knowledge of what happened between Zangri and Nelson or Curia when the process began in October and November 2004. For his part, Zangri testified that he received the Directors' Resolutions and, based on those documents, made an "assumption" that Curia had negotiated a deal to buy out Nelson's remaining shares. In fact, Thomas sent a letter to Nelson on January 13, 2005, showing that Toyota still needed a purchase agreement in order for Toyota to continue their evaluation of the proposed ownership change. Thus, neither Zangri nor Thomas provided corroborating documentation to establish the existence of the oral agreement for $4.2 million. At most, Zangri offered an "assumption" that Curia and Nelson negotiated a deal, and Thomas offered a notation that Curia agreed to buy Nelson's shares for $4.2 million. However,

Thomas had no personal knowledge of any such agreement and could not provide any evidence to support that figure or an agreement.

¶ 159    Similarly, Nour from Nissan testified that, based on his experience, there would need to be an asset purchase agreement to start the approval process, but he could not say whether one was provided in Curia and Nelson's case. And, in fact, Nour testified that he had not seen any documentation that suggested that Nelson and Curia entered into an oral agreement for the sale of Nelson's shares for $4.2 million. Although Nissan conditionally approved the proposed stock purchase agreement on December 21, 2004, their approval letter does not state a purchase price and is conditioned upon the receipt of additional documentation, including stock certificates and documentation from Fifth Third.

¶ 160    We further observe that in the October 28, 2004, letters that Nelson submitted to the automobile manufacturers, he informed them that he "proposes to sell" his shares to Curia, not that they had reached an agreement for the sale of his shares. Also, as discussed above, the fact that Curia submitted documentation to the automobile manufacturers, seeking approval for the stock sale, does not serve as evidence of the oral agreement where Curia submitted the documentation in anticipation of exercising his options and after informing Nelson of his intent to do so on November 4, 2004. Accordingly, we cannot say that the court's ruling was against the manifest weight of the evidence based on the evidence available from the automobile manufacturers.

¶ 161                                e. Fifth Third Bank and Debes

¶ 162    Nelson finally contends that the evidence provided by Fifth Third and Debes proved the existence of the oral agreement for $4.2 million. Nelson acknowledges that Debes testified that Curia and Nelson did not tell him that they had an agreement in place, but contends that this

testimony is contradicted by Debes' contemporaneous conduct and other testimony. Nelson asserts that the fact that Curia paid Fifth Third's lawyers to prepare the documents relating to the $4.2 million loan proves the agreement was in place. Nelson notes that the loan documents provided that the funds were to be used for the purchase of Nelson's shares and Debes testified that Curia could use the funds only for that the purpose. Debes also knew that the manufacturers would not process Nelson and Curia's applications unless they had an agreement in place, and he sent loan documents to the manufacturers at Curia's request to facilitate the approval process.

¶ 163   We initially observe that, like Curia's other communications with the automobile manufacturers, Debes did not send the loan documentation to the automobile manufacturers until after Curia notified Nelson of his intent to exercise his options. This is consistent with Curia's testimony that he needed to show the manufacturers that he had the funds necessary to purchase Nelson's shares. Although Debes testified that it would be inconsistent with the purpose of the loan for Curia to use the funds for any purpose other than purchasing Nelson's shares, he also testified that it was common a situation like Nelson and Curia's for the buyer to get preapproval for a loan before the final terms of the agreement were worked out. Debes testified that while he was generating the loan documents, he understood that Curia and Nelson were still negotiating because they could not agree on a price for the shares.

¶ 164   Debes's testimony and the documentation from Fifth Third thus suggest that Curia and Nelson approached Debes in anticipation of reaching an agreement for the shares. Curia sought preapproval so that he would be able to show the manufacturers that he had the funds necessary to complete the purchase. After the parties were unable to come to an agreement about the price for the shares, Curia notified Nelson of his intent to exercise his options under the 1989 SPA. Curia directed Debes to send the loan documentation to the manufacturers to facilitate the

approval process. Debes did not testify that Nelson and Curia had reached an oral agreement, and none of the loan documentation otherwise references an agreement. Accordingly, we cannot say that the court's ruling was against the manifest weight of the evidence based on the evidence available from Debes and Fifth Third.

¶ 165                                          f. Conclusion

¶ 166   Accordingly, we find that the circuit court did not err in finding that Nelson failed to establish the proximate cause aspect of his legal malpractice claim with regard to Nelson's claim for an oral agreement for $4.2 million. The evidence suggests that the proposed agreement was for the sale of Nelson's shares as well as the retirement package or perks and Nelson failed to establish Curia's acceptance of his offers. Curia's testimony and contemporaneous conduct does not suggest that he entered into an oral agreement to purchase Nelson's shares only for $4.2 million. Joyce's expert testimony was contradicted by DiVito, who testified that Nelson would not have been able to demonstrate a provable oral agreement in the Underlying Litigation, and it was within the circuit court's discretion to accept DiVito's testimony. In addition, the evidence from third parties—the automobile manufacturers, Debes, and Fifth Third—did not establish the existence of an oral agreement. We therefore find that the circuit court's ruling that Nelson failed to establish that it was more likely than not that he would have succeeded on a breach of contract claim before the district court was not against the manifest weight of the evidence.

¶ 167                    C. Quarles & Brady's Litigation Strategy

¶ 168   Nelson next contends that the circuit court erred in rejecting his claims that Quarles & Brady was negligent for failing to assert two defenses to Curia's action for specific performance. Nelson asserts that Quarles & Brady should have raised a claim that Curia's Option Exercises were invalid because they were not the mirror image of the options in the 1989 SPA and should

have argued that the parties' written agreements were ambiguous. Nelson contends that had Quarles & Brady raised these arguments before the district court, they would have been successful and would have defeated Curia's Option Exercises. Nelson further asserts that the circuit court erred in finding that Quarles & Brady's negligence in failing to raise these claims did not proximately cause his damages because he settled the case after the Seventh Circuit's remand where there was no practical alternative and continued litigation was unnecessary to preserve his legal malpractice claim.

¶ 169    As a threshold matter, we observe that Illinois law "distinguishes between negligence and mere errors of judgment." *Shanley v. Barnett*, 168 Ill. App. 3d 799, 803 (1988). The question of whether an attorney has exercised a reasonable degree of care and skill is one of fact, and expert testimony is generally required to establish the standard of care against which to measure the attorney's conduct. See *Barth v. Reagan*, 139 Ill. 2d 399, 407 (1990).[2] Here, both parties presented expert testimony regarding whether Quarles & Brady's litigation decisions deviated from the standard of care.

¶ 170    1. *The Circuit Court Did Not Err in Finding that Quarles & Brady Did Not Deviate from the Standard of Care in Not Raising a Claim that Curia's Option Exercises Were Ineffective Because They Were Not the Mirror Image of the Options in the 1989 SPA.*

¶ 171    Nelson first contends that Quarles & Brady was negligent in failing to challenge Curia's Option Exercises by arguing that the number of shares he sought to purchase in his Option Exercises did not match the number of shares listed in the 1989 SPA options. As an example,

---

[2]We observe that there is a generally recognized exception to the rule requiring expert testimony to establish the standard of care "where the common knowledge or experience of lay persons is extensive enough to recognize or infer negligence from the facts, or where an attorney's negligence is so grossly apparent that a lay person would have no difficulty in appraising it." *Barth*, 139 Ill. 2d at 407. We find, however, that this exception is not applicable to the case at bar and expert testimony was necessary to establish the standard of care.

Nelson points out that the 1989 SPA provided Curia with a second option to purchase 2009 shares of Plaza, but Curia's March 2, 2005, option exercise letter sought to purchase only 193 shares. Nelson asserts that Curia's March 3, 2005, option exercise was similarly defective because Curia "demanded" that Nelson sell his interest in Plaza's land and buildings, but the 1989 SPA provided that Curia must *offer* to purchase the land and buildings.

¶ 172   Under second option in the 1989 SPA, Curia could purchase 2009 shares of stock of Plaza and 300 shares of Mall, "which shares with previous purchased shares would represent 49% of the issued and outstanding shares of capital stock in said corporations." The third option provided that "[a]fter exercising the first two options to purchase as provided in this Agreement, [Curia] shall have a third option to purchase from [Nelson] the remaining 4,171 shares of stock in [Plaza] and 612 shares of stock in [Mall] provided that [Curia] also offer to purchase the land and four buildings of the [Plaza] dealership *** at its appraised value."

¶ 173   In his March 2, 2005, option exercise notices, Curia stated that the second option in the 1989 SPA "gives me the right to purchase from you an additional number of shares of capital stock of [Plaza] and [Mall] that would give me 49% of the outstanding capital stock of each Corporation, which I calculate to equal 193 shares and 170 shares, respectively." In his March 3, 2005, option exercise, Curia sought to purchase Nelson's remaining shares in Plaza and Mall and offered to also purchase Plaza's land and buildings in accordance with the third option in the 1989 SPA.

¶ 174   Joyce testified that a reasonably careful lawyer, seeking to prevent Curia from exercising the options in his March 2005 Option Exercises, would have raised the argument that Curia's Option Exercises were defective because they were not a mirror image of the options in the 1989 SPA as required by Illinois law. Joyce testified that as a result of the corporations'

recapitalization after the 1989 SPA, it would have been impossible for Curia to exercise his options under the terms of the agreement because the 1989 SPA did not permit the percentages or number of shares to be modified because of recapitalization. Joyce opined that if Quarles & Brady had raised an argument that Curia's Option Exercises were defective because they were not a mirror image of the options in the 1989 SPA, it was more probably true than not that the argument would have "prevailed."

¶ 175   Joyce acknowledged that Quarles & Brady did raise an argument before the district court that the Option Exercises were defective because Curia attempted to use the price formula in the 1993 Modification rather than the formula provided by the options in the 1989 SPA, but that argument was rejected by the district court. Joyce testified that although Quarles & Brady made this mirror image argument, it included the wrong facts to support the argument, and should have raised the discrepancy in the number of shares.

¶ 176   In contrast, DiVito testified that the standard of care did not require Quarles & Brady to raise an alternative argument that Curia's Option Exercises were defective because the number of shares he sought to purchase did not match the 1989 SPA. DiVito testified that the second option in the 1989 SPA provided Curia with the option to purchase a percentage of the remaining shares, 49%, and the third option permitted him to purchase the "remaining" shares, which is what Curia sought in his Option Exercises. DiVito also noted that, in his review of Quarles & Brady's materials, a draft brief contained an argument that Curia's Option Exercises were invalid because the number of shares he sought to purchase were different from the options in the 1989 SPA. DiVito testified that the fact that this argument did not appear in the final draft of the brief suggests that Quarles & Brady made a judgment to not include this argument, which was reasonable and consistent with the standard of practice.

¶ 177   The circuit court's order demonstrates that it clearly accepted DiVito's testimony on this issue and not Joyce's. As discussed, it was within the province of the trial court to accept DiVito's testimony over Joyce's on this issue. See *Robrock*, 2012 IL App (4th) 110590, ¶ 42. The trial court is accorded such deference because it is in the best position to resolve conflicting testimony and observe the witnesses' demeanor and determine their credibility. *Radke*, 307 Ill. App. 3d at 977 (citing *Flynn v. Cohn*, 154 Ill. 2d 160, 169 (1992)). Here, the court was required to weigh conflicting testimony from the expert witnesses. The court could also consider Shifflett's testimony that he considered raising an argument regarding the discrepancy in the number of shares, but ultimately decided not to, as evidenced by the draft brief containing this argument. Shifflett testified that he did not raise the issue because the 1989 SPA options granted Curia the right to purchase "49%" and then the "remaining" shares and this language was echoed in Curia's Option Exercises, as DiVito also acknowledged.

¶ 178   Nelson contends, however, that Shifflett testified that his decision to not raise this argument was based on *McCarthy v. Johnson*, 122 Ill. App. 3d 104 (1983). Nelson asserts that there is no evidence that Quarles & Brady was aware of this case during Quarles & Brady's representation of Nelson and that *McCarthy* does not even support Shifflett's position, as Joyce testified. As discussed, the circuit court heard Shifflett's testimony that he relied on *McCarthy* to support his decision and heard Joyce's testimony that *McCarthy* did not support Shifflett's position. The court also heard DiVito's testimony that Quarles & Brady did not deviate from the standard of care in not raising a mirror image argument because the percentages listed in Curia's Option Exercises matched the percentages listed in the 1989 SPA options, as Shifflett also testified. Thus, there was conflicting testimony on this issue and, as noted, in such situations we accord deference to the decisions of the circuit court. *Radke*, 307 Ill. App. 3d at 977. Here, there

was ample evidence to support the circuit court's conclusion, and we cannot say, based on the record before us, that circuit court's decision was against the manifest weight of the evidence.

¶ 179   Finally, although not expressly addressed by either expert, Nelson contends that Curia's attempt to exercise his third option was defective because he "demanded" that Nelson sell Plaza's land and buildings rather than merely offering to purchase them as provided in the 1989 SPA. In his March 3, 2005, option exercise notice, however, Curia noted that the third option "gives me the right to purchase your remaining shares of the Corporations; [*sic*] provided that I also offer to purchase the land and four buildings of [Plaza]." Curia then stated that he was giving notice of the exercise of his option to "purchase all of your remaining shares of capital stock in the Corporations and the Land and Buildings for the consideration and upon the terms set forth in the [1989 SPA] and the [1993 Modification]." This language does not suggest a "demand" that Nelson sell his interest in Plaza's land and buildings, but rather shows Curia's intent to comply with the terms of the 1989 SPA. Thus, there was no basis for Quarles & Brady to raise an argument concerning the Curia's March 3, 2005, option exercise in the district court.

¶ 180   Even assuming, *arguendo*, that we determined that Nelson had adequately established that Quarles & Brady deviated from the standard of care in failing to raise this argument, we would nonetheless find that he failed to establish the proximate cause or "case within a case" element of his legal malpractice claim on this issue. Although Joyce testified that, in his opinion, it was more likely true than not that Nelson would have prevailed on this argument if Quarles & Brady had raised it before the district court, DiVito testified that such an argument would be meritless because Curia's Option Exercises essentially comported with the 1989 SPA options by seeking to purchase "49%" and the "remaining" shares outstanding. As discussed, the circuit court accepted the testimony of DiVito over Nelson on this issue, and that is consistent with its

role as the trier of fact. The record also shows that the district court rejected a "mirror image" argument by Quarles & Brady regarding the formula for determining the price of the shares. Furthermore, as illustrated above, Nelson's contention that Curia's March 3, 2005, option exercise was defective because Curia "demanded" that Nelson sell Plaza's land and buildings is similarly meritless. Accordingly, we cannot say that the circuit court's ruling that Nelson failed to establish the proximate cause element of his legal malpractice claim with respect to this argument was against the manifest weight of the evidence.

¶ 181    2. *The Circuit Court Did Not Err in Finding that Quarles & Brady Did Not Deviate from the Standard of Care in Not Raising a Claim that the Written Agreements Were Ambiguous.*

¶ 182    Nelson finally contends that Quarles & Brady deviated from the standard of care in failing to argue that the written agreements were ambiguous. Nelson asserts that this argument would have defeated Curia's motion for summary judgment because an ambiguous contract cannot be interpreted as a matter of law and therefore cannot be disposed of by summary judgment. Nelson maintains that if Quarles & Brady had raised this argument, the parties would have been permitted to enter extrinsic evidence showing that when Curia and Nelson entered into the 1993 modification, they intended to dissolve the options in the 1989 SPA. Nelson contends that Quarles & Brady also would have been able to introduce extrinsic evidence regarding the meaning of the word "subsequently" in Paragraph 5 of the 1993 Modification, and would have been able to question Curia about his understanding of that paragraph at a deposition.

¶ 183    As with the mirror image argument, the parties offered conflicting expert testimony on this issue. Joyce testified that reading Nelson and Curia's written agreements together, there is no clear specification for how Curia could exercise his options. Joyce testified that if Quarles & Brady had argued ambiguity, it would have prevented a summary judgment ruling and the parties

could have introduced extrinsic evidence regarding what Curia believed when he entered into the agreements. Joyce opined that within a reasonable degree of certainty, an argument that the contracts were ambiguous would have prevailed.

¶ 184  In contrast, DiVito testified that it was reasonable under the circumstances for Quarles & Brady to argue that the agreements were not ambiguous. He opined that Quarles & Brady's argument that Paragraph 5 of the 1993 Modification negated any unilateral right by Curia to exercise the options in the 1989 SPA was a reasonable one. DiVito further testified that there was no downside to arguing that the agreements were not ambiguous because the district court could find ambiguity regardless of what the parties claimed.

¶ 185  As discussed above, the circuit court was entitled to accept DiVito's testimony over Joyce's on this issue. The court also heard Shifflett's testimony that he believed it was not in Nelson's best interest to advance an argument that the agreements were ambiguous in the motion for summary judgment. Shifflett testified that he considered doing discovery on the issue of ambiguity, but believed that Quarles & Brady had a good basis to argue that the agreements were not ambiguous, given the language that Nelson and Curia used in them. Shifflett believed that it would not have been in Nelson's best interest to spend money taking depositions to try to prove an ambiguity.

¶ 186 Nelson contends, however, that if Quarles & Brady had raised a claim that the agreements were ambiguous, it could have challenged Curia's assertion that, in Paragraph 5 of the 1993 Modification, the parties intended to use the word "previously" instead of "subsequently." The record shows, however, that Quarles & Brady did challenge this assertion in their briefing before the district court. In conjunction with arguing that the agreements were not ambiguous, Quarles & Brady contended that the court should not accept Curia's interpretation of

Paragraph 5 of the 1993 Modification and should enforce the contract as written, which would require Curia to negotiate with Nelson if he wished to purchase his shares. Given the evidence presented, we cannot say that the circuit court's findings "appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner*, 202 Ill. 2d at 252. Accordingly, we find that the circuit court's ruling that Nelson failed to demonstrate that Quarles & Brady was negligent in deciding to not argue that the agreements were ambiguous was not against the manifest weight of the evidence.

¶ 187    We further find that Nelson has failed to establish the "case within a case" aspect of his legal malpractice claim with respect to his argument that Quarles & Brady should have raised a claim that the agreements were ambiguous. Nelson asserts that such an argument would have permitted Quarles & Brady to submit extrinsic evidence to show the parties' intent with respect to the agreements, but Nelson did not identify any evidence in the circuit court or before this court in support of this claim. At trial, Joyce testified that Quarles & Brady may have been able to offer testimony from the person who drafted the contracts or the corporations' accountants, but acknowledged that he did not know what these witnesses would say. Joyce also testified that Quarles & Brady could depose Curia, who might testify that he did not know what the word "subsequently" meant in Paragraph 5 of the 1993 Modification. Nelson also offered his own testimony that he and Curia intended to eliminate the 1989 SPA options when they entered into the 1993 Modification.

¶ 188    Contrary to Nelson's testimony that he and Curia intended to abrogate the 1989 SPA options when they entered into the 1993 Modification, Curia's conduct suggests otherwise. Most notably, Curia notified Nelson of his intent to exercise those options, once in November 2004 and again in March 2005. On September 2, 2005, Curia submitted an affidavit in the district

court in which he averred that he did not believe that the 1993 Modification abrogated the 1989 SPA options. Joyce identified some potential witnesses who could offer extrinsic evidence, but offered no testimony regarding what they might say and Nelson offered no other evidence to suggest that these potential witnesses could offer any admissible extrinsic evidence. Thus, Nelson has failed to identify any evidence, other than this own testimony, that could have been submitted as extrinsic evidence if Quarles & Brady had raised a claim that the written agreements were ambiguous in the district court. Accordingly, we find that the circuit court's ruling that Nelson failed to establish the proximate cause element of his legal malpractice claim with respect to this argument was not against the manifest weight of the evidence.[3]

¶ 189                                   III. CONCLUSION

¶ 190    For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 191    Affirmed.

---

[3]We observe that the circuit court found that Nelson failed to establish the proximate cause element of this claim and that Quarles & Brady was negligent in failing to raise a claim that Curia's Option Exercises were defective because they were not the mirror image of the 1989 SPA options. The circuit court found that Nelson elected to settle the case with Curia after the Seventh Circuit reversed and remanded the case and thus forfeited his right to pursue these claims on remand. Both parties addressed this issue in their briefs before this court; however, we find that it is unnecessary to examine this issue where we have determined that Nelson failed to establish the proximate cause element of these claims for the reasons discussed above. Although the circuit court did not rely on the factors identified by this court in rendering its judgment, we observe that we may affirm the circuit court's ruling on any basis in the record, regardless of whether the circuit court relied on those grounds and regardless of whether the circuit court's reasoning was correct. *Leonardi v. Loyola University Chicago*, 168 Ill. 2d 83, 97 (1995).